**352**

COAST–TO–COAST FINANCIAL COR-
PORATION, Coast Partners, UBH,
Inc., Plaintiffs,

Federal Deposit Insurance Corporation, as
Receiver for Superior Bank FSB, Hins-
dale, Illinois, Substituted Plaintiff,

v.

THE UNITED STATES, Defendant.

No. 95–525C.

United States Court of Federal Claims.

April 18, 2002.

Melvin C. Garbow, Washington, D.C., for plaintiffs Coast–To–Coast Financial Corporation, Coast Partners, and UBH, Inc. With him on the briefs were Howard N. Cayne, Kent A. Yalowitz, Edward Sisson, and Todd A. Wynkoop, all of counsel. Hugo A. Zia for plaintiff Federal Deposit Insurance Corporation. With him on the briefs were Catherine Topping, William A. Gray, William S. Jones, John Elmore, and Bruce C. Taylor, all of counsel.

Glenn I. Chernigoff, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Scott D. Austin, Paul G. Freeborne, Jeffrey T. Infelise, Brian A. Mizoguchi, and Brian L. Owsley, all of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related [1] case are plaintiffs Coast–To–Coast Financial Corporation ("CTC"), Coast Partners, and UBH, Inc.'s (all three hereafter referred to as CTC) Motion for Partial Summary Judgment on Liability on their Guarini Claim; defendant United States' Cross–Motion for Summary Judgment with Respect to Plaintiffs' "Tax Benefit" Claims; plaintiff Federal Deposit Insurance Corporation's ("FDIC") Motion for Partial Summary Judgment on Liability on its Guarini Claim; and the government's Motion to Compel and for an Extension of Time for Discovery.[2] Oral argument was held on March 14, 2002. For the reasons set out below, CTC's and FDIC's motions for partial summary judgment are granted, the government's cross-motion for summary judgment is denied, and its motion to compel and for an extension of time is granted.

## BACKGROUND

This is a "tax benefit" case.[3] Against the backdrop of the Savings and Loan crisis of the 1980s, Old Lyons, a federally chartered mutual association, became insolvent. By September 1987, its financial condition had so deteriorated that action by the Federal Home Loan Bank Board ("FHLBB") became necessary. Accordingly, FHLBB appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver for Old Lyons, transferred its assets and liabilities to a new mutual association, Lyons Savings, a Federal Savings and Loan Association, Countryside, Illinois ("Lyons"), which was ultimately renamed Superior Bank, FSB ("Superior"), and appointed new management and directors. These actions were insufficient to solve the thrift's financial problems, so FSLIC sought proposals from investors interested in acquiring Lyons. It issued a document entitled "Information and Instructions for the Preparation and Submission of Proposals for the Acquisition of: Lyons SA, a FS & LA Countryside, IL" (the "RFP").

In the RFP, FSLIC advertised the availability of tax benefits to potential investors as an inducement to purchase Old Lyons. The RFP's "Tax Benefits" section states:

> [T]he Internal Revenue Code of 1986 *presently* contains three provisions that provide favorable Federal income tax consequences to a taxpayer that acquires a savings and loan institution in an FSLIC-assisted transaction. First, most FSLIC-assisted acquisitions will qualify as a tax-free reorganization under Section 368(a)(1)(G) of the Code. Because of this, the tax basis of the assets of the acquired Institution will carry over to the acquiror and permit the acquiror to recognize a tax loss upon the disposition of an acquired asset which has a tax basis greater than its fair market value. Second, if the transaction qualifies as a tax-free reorganization, Section 382 of the Code generally

---

1. *United States v. Winstar Corp.* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. On January 19, 2000, we held that CTC was entitled to discovery of various documents pertaining to its contract with the government.

*Coast–To–Coast Fin. Corp. v. United States,* 45 Fed. Cl. 796 (2000).

3. *See Centex Corp. v. United States ("Centex I"),* 48 Fed.Cl. 625 (2001).

will permit any net operating loss carry-over of the acquired institution to be utilized by the acquiring institution to offset post-acquisition taxable income. Third, Section 597 of the Code provides that FSLIC assistance payments received by a savings and loan institution are not includible in income and do not require a reduction in the basis of other assets. These consequences often occur under state income tax laws as well.

*These provisions have the effect of permitting an acquiring institution to realize tax benefits attributable to a particular item even though FSLIC assistance is received with respect to such item. For example, if the acquiror receives coverage for capital losses incurred on the disposition of identified assets of the acquired institution, the acquiror is entitled to deduct such loss for federal income tax purposes, notwithstanding that it is reimbursed for the loss by the FSLIC, and that the FSLIC payment is tax free.* Similarly, if payments are made by the FSLIC to an acquiror pursuant to a yield guarantee, such assistance need not be reported as taxable income by the acquiror.

These provisions were intended to *aid the FSLIC by reducing the amount of FSLIC assistance that should be required by an acquiring institution* for a particular cost, expense or loss by the amount of the tax benefit obtained by the acquiring institution with respect to such cost, expense or loss. This reduction in required assistance can be realized by the FSLIC in one of two ways: (1) Assistance amounts to be paid by FSLIC . . . can be reduced by the amount of the tax benefit available . . . . For example, if capital loss or undisclosed liability coverage is requested, and the combined marginal federal and state income tax rate is 40%, FSLIC can pay 60% of any loss or liability incurred and the acquiring institution can recover the remaining 40% of the loss or liability through a deduction for the loss or liability on it[s] tax returns. (2) Assistance amounts can be paid in full by FSLIC . . . and the acquiring institution can return to FSLIC the allocable tax benefit when it is realized by the filing of income tax returns.

Thus, under this method in the above example, FSLIC will pay 100% of the loss or liability and the acquiring institution will pay the tax benefit to FSLIC when the tax returns recognizing such benefit are filed.

RFP at 6–7 (first and second emphasis added) (paragraph numbers omitted).

In a February 1988 marketing conference concerning Old Lyons, FSLIC negotiators explicitly discussed the provision of tax benefits as an incentive to acquire Old Lyons. Herbert Held, Regional Director, Mergers and Acquisitions, MAD, FSLIC, told prospective acquirers that "tax benefits . . . are very substantial at Lyons." Agenda, Marketing Conference, Lyons SA, a FSL & A, Countryside, Illinois (Feb. 25, 1988) at 17. Moreover:

> If you're a taxpayer and there's a capital loss on an asset of a hundred dollars, that would immediately reduce your tax burden and we could tax affect that payment based upon tax rate say 35 percent and only pay the acquirer $65 instead of 100 and the acquirer would recover the remaining balance through its reduction in tax burden.

*Id.* at 18. Additionally, an undated Financial Assistance Division document, entitled "Considerations in Negotiating Assistance Agreements," listed "Tax Benefits" as one consideration.

In March 1988, FSLIC sent a copy of the RFP to the investors who would eventually form plaintiffs Coast–To–Coast Financial Corporation, Coast Partners, and UBH, Inc. The deposition of at least one of those investors, Alvin Dworman, indicates that they were interested in acquiring the tax benefits offered by FSLIC. Dep. of Alvin Dworman (June 6, 2000) at 21. It was known at the time that the FSLIC-specific tax provisions were set to expire on December 31, 1988, at least with respect to transactions consummated after that date. This added to the sense of urgency that the deals be done before their elimination. When asked in a deposition about the availability of the tax benefits, Nelson Stephenson, a banking expert secured by one of CTC's initial investors, stated that "[m]y general recall on [the

tax benefits the Government sought to make available to institutions acquiring failing thrifts] is that the Congress was discussing law change, and the context of the proposals were these are the benefits that are available today." Dep. of Nelson L. Stephenson (May 19, 2000) at 43, 45–46.[4]

On April 11, 1988, CTC submitted a bid for Old Lyons, offering to acquire it if FSLIC provided: (1) a cash payment in the amount of New Lyons' consolidated negative net worth (minus a few exclusions); (2) guarantees concerning the income from and value of "FSLIC Assets;" (3) guaranteed yield on certain covered assets; (4) protection against loss on the disposition of covered assets; (5) indemnification for certain claims made against CTC or old Lyons; and (6) a share of the economic value represented by the tax benefits. Coast–To–Coast Financial Corp., "Proposal to Acquire Lyons Savings, a Fed. Savings & Loan Assoc." (April 11, 1988) ("April Proposal") at 3–13. In exchange for these benefits, CTC offered to reimburse FSLIC for any cash savings "realized from the reduction of federal taxes," but excluded from that sharing any tax savings attributable to losses on covered assets.[5] Id. at 13.

The April Proposal further stated that "[t]he Proposal Instructions also requested an alternative bid if all tax benefits are returned to the FSLIC. If all tax benefits are returned to the FSLIC, Coast–To–Coast respectfully withdraws this bid." Id. CTC also conditioned its offer on a determination by their tax advisor that "Lyons' 'loss carryforwards' will transfer to Coast–To–Coast without reductions as a result of the merger." Id. at 14.

Paragraph X of the April Proposal stated that "the tax basis of the assets of the acquired institution will carry over to the acqui-

ror and permit the acquiror to recognize a tax loss upon the disposition of an acquired asset which has a tax basis greater than its fair market value." Id. at 12. Thus, the proposal established CTC's intention that tax savings resulting from the deal would go to the holding company, not the bank.

On May 16, 1988, FSLIC rejected the April Proposal's tax benefit sharing provisions and requested "additional loss sharing" by CTC of the tax benefits imbedded in Lyons' assets. Letter from Herbert J. Held, Regional Director, Mergers and Acquisitions Div., FSLIC, to Sandra Johnigan, President, CTC Fin. Corp. (May 16, 1988) at 2. It proposed that gains on these assets were to be shared as follows: "all yield subsidy payments to be refunded to FSLIC. Then, to the extent there are additional gains, these gains will be shared 80% to FSLIC, 20% CTC, up to total gains of $5 million, FSLIC's share to decline by 5% for each subsequent $5 million in total gains." Id. at 2. Additionally, FSLIC proposed that "[a]ll tax benefits resulting from FSLIC loan loss coverage, yield payments and indemnifications, will be returned to FSLIC when and to the extent realized, as these payments are already nontaxable. Tax benefits resulting from Lyons' NOLs to be shared 60% FSLIC, 40% CTC." Id.

On June 23, 1988, in response to FSLIC's counter-offer, CTC revised its tax benefits proposal to "reimburse FSLIC for *50 percent of* any cash savings realized from the reduction of federal taxes to the extent the reduction was a direct result of Lyons' *pre-acquisition* net operating loss carryforwards as of the date of acquisition, tax free FSLIC yield coverage *or the tax free interest payments on the FSLIC note.*" Coast–To–Coast Financial

---

4. In November 1988, Congress enacted the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, 102 Stat. 3342 ("TAMRA"). TAMRA extended the sunset of the FSLIC-specific tax provisions to December 31, 1989, but cut by fifty percent the tax benefits for FSLIC-assisted acquisitions occurring after December 31, 1988.

5. The proposal defined "Covered Assets" as:
   Assets held by Lyons as of the acquisition date which meet any of the following criteria:

(a) Real estate owned, real estate held for investment, including joint ventures, and real estate in judgement.
(b) Investments (debt and equity) in any service corporation as of the date of the acquisition.
(c) Scheduled items and all mortgage and non-mortgage loans sixty days or more delinquent, or which become sixty days delinquent within one year of the acquisition.
Id. at 5.

Corp., *"Amended* Proposal to Acquire Lyons Savings, a Federal Savings & Loan Assoc." (June 23, 1988) ("June Proposal") at 14. Again, CTC declined to share tax benefits related to losses associated with covered assets from its offer.

On September 26, 1988, CTC submitted a new proposal to FSLIC. Paragraph X of the proposal, entitled "Tax Benefits," stated:

Coast–To–Coast proposes to reimburse FSLIC for tax benefits through an in lieu of tax calculation based on Lyons' income before federal income tax, as a separate entity. The income is to be computed in accordance with generally accepted accounting principles, on a separate entity basis. Lyons will be accounted for as a division of a newly to be named thrift that may purchase and/or merge with other financial institutions in the future. The division, Lyons, will be considered as the separate entity for this computation. To the extent that Lyons, as a separate entity, has income before federal income tax, FSLIC will be paid seventy-five percent of thirty percent of such income in lieu of tax. This calculation will begin in year one and be discontinued at the end of five years.

Coast–To–Coast Financial Corporation, "Amended Proposal to Acquire Lyons Savings, a Federal Savings & Loan Association" (September 26, 1988) ("September Proposal") at 14. CTC made additional amended proposals in October and November; however, paragraph X of these proposals differed from the September proposal only in that the calculation was to be discontinued at the end of ten years, instead of five.

FSLIC was interested in this approach, but as a condition for approval of CTC's acquisition of Old Lyons, FSLIC required it to provide a business plan for the operation of Lyons/Superior. CTC provided FHLBB with this plan on December 5, 1988, and supplemented it on December 22. The plan contained a ten-year income projection which included annual line items entitled "In lieu of payments-FSLIC." Supplemental Business Plan for Proposed FSLIC Acquisition (Dec. 22, 1988) ("Supplemental Plan"). On December 27, 1988, FSLIC accepted the Supplemental Plan, including the income projection.

As part of its contract with CTC, FSLIC executed an Assistance Agreement (the "Agreement") and a Tax Certification. As a result, Superior became a wholly-owned subsidiary of CTC. In return, CTC was provided with financial assistance, including: (1) a "FSLIC Promissory Note in the principle amount equal to Negative Regulatory Capital, less $10 million," § 6(a); (2) "Cash payment or FSLIC promissory note(s) in an amount equal to difference between book value and fair market value of certain assets, and liabilities less $14 million," § 6(a); (3) "Reimbursement for losses resulting from capital losses on Covered Assets, write-down of Covered Assets and for certain related costs and expenses," §§ 3(a) and 4; (4) "Guaranteed yield on certain Covered Assets," § 3(a); (5) "Indemnification for certain unreserved for Claims against [Lyons] and litigation challenging the Transaction," §§ 3(a) and 7(a); and (6) "Indemnification for expenses of pursuing Related Claims," §§ 3(a) and 7(b). Assis. Agree. Among FSLIC, Coast–To–Coast Fin. Corp., and Lyons Savings Bank, a Fed. Savings Bank, Hinsdale, Illinois (December 30, 1988) at i.

The Agreement did not contain a tax sharing provision; instead, it contained section 3(c)(6), entitled "Payments in Lieu of Tax Benefits." Section 3(c)(6) stated:

§ 3 *Special Reserve Account.* [Lyons] shall establish as of the Effective Date a memorandum account, with an opening balance of zero, to be called the Special Reserve Account, and shall maintain such account solely for the purpose of, and in accordance with, the provisions of this Agreement.

. . . .

(c) *Credits to Special Reserve Account.* [Lyons] shall promptly credit each of the following items to the Special Reserve Account, to the extent that such item was not shown as an asset on the Books and Records, as adjusted by the Initial Audit:

. . . .

(6) *Payments in Lieu of Tax Benefits. Twenty-two and one-half percent (22.5%) of all net income of [Lyons], calculated annually. Such net income*

*shall be determined in accordance with generally accepted accounting principles, as applied to the savings and loan industry,* except that (i) federal and state income taxes shall not be taken into account; (ii) *[Lyons] shall not be consolidated with any other entity for purposes of determining net income;* and (iii) if [Lyons] is merged into another Affiliate of [CTC], or if another entity is merged into [Lyons] while [Lyons] is under [CTC's] ownership or control, [Lyons] shall nonetheless be treated as a separate entity for purposes of determining net income . . . .

(First and second emphasis added). The net result was that, in lieu of splitting up the actual tax savings generated by Lyons, FSLIC, in effect, became a stakeholder in its future profitability.

It is clear that government negotiators understood that the covered asset loss tax benefit to CTC would exist over the life of the contract. In a memorandum to FHLBB, Stuart D. Root, Executive Director of FSLIC, wrote that CTC had "agreed to pay to FSLIC, for 10 years in cash, 22.5% of the net income before taxes of New Lyons." Stuart D. Root, Exec. Dir., FSLIC, Executive Summary, *FSLIC-assisted acquisition of: Lyons Savings Association, a Federal Savings and Loan Association, Countryside, Illinois, FHLBB No. 8443* (Dec. 29, 1988) ("Executive Summary") at 2. It is also clear what the parties' understanding was as to the origin of this provision: "This income sharing substitutes for tax benefit sharing." *Id.* at 2. Price Waterhouse's 1990 evaluation of Coast-To-Coast's acquisition of Old Lyons also recognized that "[i]n lieu of tax benefit sharing, the Assistance Agreement includes a 10-year income sharing agreement under which Superior will pay to FSLIC 22.5% of Superior's net income before deduction for federal and state income taxes." Price Waterhouse Case Report, Case No. C-389 (Aug. 21, 1990) ("Price Waterhouse Evaluation") at 7. An "undated" FHLBB "Fact Sheet" summarizing the terms of the transaction stated that CTC had "agreed to pay FSLIC, for 10 years, in cash, 22.5 percent of the net income before taxes of Lyons Savings Bank. This

income sharing substitutes for tax benefit sharing."

The Agreement contained a "Continuing Cooperation" clause which stated that one purpose of the Agreement was to enable CTC and Lyons to "receive the benefits and assume the risks contracted for." § 30. Under this clause, the parties promised that they would "in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement," including CTC's and Superior's receipt of the benefits they contracted for. *Id.*

Following the consummation of the Agreement, as well as similar agreements between the government and other institutions, the government began to reconsider its position with regard to the continuing availability of covered asset loss deductions. We discussed in detail the government's change of heart in *Centex Corp. v. United States ("Centex II")*, 49 Fed.Cl. 691 (2001). Because *Centex* involved the same background facts as included in this record, we incorporate those findings by reference. *See* 49 Fed.Cl. at 699–707. In sum, they establish that the government enacted the Guarini legislation in order to target and eliminate the covered asset loss deduction it had held out to plaintiffs like CTC as an incentive to acquire failing thrifts.

Because the FDIC is a party to this litigation, certain additional facts relating to FIRREA are also relevant. FIRREA set up three separate insurance funds: the Bank Insurance Fund, the Savings Association Insurance Fund ("SAIF"), and the FSLIC Resolution Fund ("FRF–FSLIC"). The latter succeeded by operation of law to the assets, liabilities, and certain functions of FSLIC. 12 U.S.C. § 1821a(a)(2) (1994). FDIC manages all three funds, but each must be separately maintained and cannot be commingled. 12 U.S.C. §§ 1821(a)(4) & (6), 1821a(a)(1). SAIF's purpose is to insure the deposits of SAIF member institutions, which are predominantly savings associations supervised by the Office of Thrift Supervision ("OTS"). 12 U.S.C. § 1821(a)(6)(B). These institutions are responsible for funding SAIF. *Id.;* § 1821(a)(6)(C).

FSLIC insured Superior's deposits prior to the passage of FIRREA. Pursuant to FIR-

REA, Superior became a SAIF member institution on August 9, 1989. § 1817(1)(3)(B). On July 27, 2001, FDIC placed Superior into receivership and was substituted as its receiver.

## DISCUSSION

CTC argues that, by enacting the Guarini legislation, the government eliminated the Agreement's tax benefits in a way that it breached an implied covenant of good faith and fair dealing, breached an express promise to use its "best efforts" to assure plaintiffs of the benefits of their bargain, and breached representations and warranties it made to CTC to induce it to acquire Old Lyons. It also contends that these actions constitute a taking within the meaning of the Fifth Amendment and a violation of the Due Process Clause of the Constitution.

*The Cross–Motions for Partial Summary Judgment*

We held on similar facts in *Centex* that the government violated an implied covenant of good faith and fair dealing when, after inducing Centex to enter into a contract taking over several defunct banks, in part by advertising the availability of a covered asset loss tax deduction, Congress targeted this same deduction for retroactive repeal. The primary question here is whether the differences in contract language between *Centex* and this case call for a different result. For the reasons set out below, we conclude that they do not. It is unnecessary to consider other theories of liability plaintiff offers, which we understand to be in the alternative.[6]

The government argues that the implied covenant cannot "attach" or "fix" to the Agreement in order to protect a tax deduction because section 3(c)(6) of that document concerned a sharing of Superior's income-not CTC's tax deductions. *See Alaska v. United States*, 35 Fed.Cl. 685, 704 (1996), *aff'd*, 119 F.3d 16, 1997 WL 382032 (Fed.Cir.1997) ("The implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the

parties."); *see also First Nationwide Bank v. United States ("First Nationwide I")*, 48 Fed.Cl. 248, 264 (2000) ("In the absence of a promise by plaintiffs to make tax benefit payments, there is no duty to which plaintiffs' proposed condition, enactment of the Guarini legislation, can attach."). It correctly points out that the implied covenant must be grounded in "the express provisions of th[e] contract." *Solar Turbines, Inc. v. United States*, 26 Cl.Ct. 1249, 1274 (1992), *aff'd*, 114 F.3d 1206, 1997 WL 291971 (Fed. Cir.1997) (quoting *Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 156 (1991)).

*Centex* is distinguishable, according to the government, because there we premised our conclusion that the government breached the implied covenant of good faith and fair dealing upon our observation that, "[w]hen the parties to the contract here agreed to a fifty-fifty split of the benefits derived from the covered asset loss deduction, that ratio, as a matter of contract, was fixed." 49 Fed.Cl. at 708. The government argues that the Agreement in this case, on the other hand, required that FSLIC receive part of Superior's income before taxes-not that FSLIC receive any portion of the tax deductions realized. Thus, it asserts, because the parties here did not specifically incorporate a split of tax benefits into the contract, as they did in *Centex*, we cannot "robotically" apply *Centex's* conclusion.

We disagree with defendant, however, that there is nothing in the Agreement to which an implied covenant could attach. The relevant language is found in the PIL provision. The only difference between the facts in this case and *Centex* is that, instead of agreeing to divide after the fact the benefits generated under the tax laws of CTC's acquisition of Lyons, the parties fixed an estimated but guaranteed stand-in for the government's share of those benefits: 22.5% of Superior's annual income. It was unnecessary for the parties to treat as an item of contract language what they already understood the law to provide: that Superior was the entity which, under the law, could claim all the tax

---

6. Neither an express promise locking in the covered asset loss deduction nor the authority to make that promise are necessary to CTC's claim

because the implied covenant of good faith and fair dealing serves to protect its expectations regarding the tax benefits.

benefits for itself. Indeed, it would have been unauthorized for FSLIC to "make up" tax laws as part of the contract or bind Congress to continue them. Instead, what the parties expressly contracted for was a division of the consequences of those benefits. The PIL provision thus represents the express exchange of tax benefits between the parties. CTC kept 100% of whatever the tax consequences worked out to be, but only after committing 22.5% of Superior's net income to FSLIC's as its share of the tax benefit.

Tax benefits were at the center of the deal—CTC entered the contract because the government offered to place it in a position to take advantage of these benefits in exchange for acquiring an ailing thrift. The implied covenant of good faith and fair dealing attaches to the Agreement at the PIL provision and, as a result, the government was obligated not to enact legislation targeted at taking away the fruit of the contract: CTC's opportunity to keep 100 percent of the tax benefits.[7]

Defendant's proposed reading of the contract—that the "in lieu" provision simply appears with no predicate or corresponding obligation by the government—requires the suspension of rationality, as well as reading out of the contract the phrase, "Payments in Lieu of Tax Benefits." Ignoring that language is reminiscent of the frantic plea of the Great Oz: "Pay no attention to that man behind the curtain." The parties plainly operated on the understanding that the tax law (embodied in IRC sections 165, 166, 362, 368, 382, 593, and 597) permitted a deduction of covered asset losses. We held earlier that this understanding was correct. They also understood that this feature, as well as others in the tax code, would yield substantial cash benefits to investors, like CTC. *See Centex Corp. v. United States ("Centex I"),* 48 Fed.Cl 625 (2001). Indeed, this phenomenon was intentionally built into the law, and subsequently reaffirmed, in order to assist the regulatory agencies in disposing of the assets of failing banks.

In addition, we note that the assistance agreements in *Centex, First Nationwide,* and *Coast–To–Coast* all place the provisions dealing with distribution of tax benefits in a section 3 setting up a "Special Reserve Account" ("SRA"). That account maintained the various debits and credits arising out of the parties' obligations under the agreement, including tax sharing or "in lieu" payments. The SRA was the mechanism by which the plaintiffs in these cases provided compensation, through a defined credit item, to the government in return for the opportunity to take advantage of the tax benefit provisions they contracted for. The credits that plaintiffs provided reduced the government's net financial obligation to them while increasing their net obligation to the government. *See Centex* Assistance Agreement § 3(b)(4); *First Nationwide* Assistance Agreement § 3(b)(2); *Coast–To–Coast* Assistance Agreement § 3(c)(6). The plaintiff thrifts would sum the debits and credits entered in the SRA and then demand or make a net payment, depending on whether or not they owed the government money. This mechanism is thus another manifestation within the contract of the parties' obligations with respect to tax benefit sharing.

Documents[8] generated by the parties during negotiations also indicate that they recognized the PIL provision as the mechanism substituting for tax benefit sharing. *See* Root, Executive Summary (Dec. 29, 1988) at 2 ("CTC has agreed to pay to FSLIC, for 10 years in cash, 22.5% of the net income before taxes of New Lyons. This income sharing substitutes for tax benefit sharing."); Arthur Young, Mem., *Lyons Federal Analysis of Tax Attributes* (Dec. 3, 1988) at 4 ("In addition Lyons will be required to make a payment to the FSLIC, in lieu of a tax sharing agreement."). Furthermore, the FHLBB tax certificate integrated into the contract (through section 26 of the Agreement, which incorporates into the Agreement "any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board")

---

**7.** This explains why the "in lieu" provision used GAAP accounting rather than tax accounting.

**8.** CTC offers depositions for this proposition, as well. We believe the documents are more persuasive evidence of the parties' recognition of the PIL provision as a substitute for tax sharing.

also indicates the parties' recognition of the importance of the tax benefits to the contract. FHLBB Res. 88–1552P (Dec. 30, 1988) at 16. Thus, the "spirit of the bargain"—i.e., CTC's expectation—was that CTC would be eligible to take advantage of the tax benefits over the entire ten-year duration of their Agreement without the government's subsequent legislating for its own pecuniary interest.

Because the implied covenant demands enforcement of the spirit of the bargain, we may look beyond the fact that the Agreement does not expressly guarantee the covered asset loss deduction over the course of its life. The documents evidencing the course of dealing between the parties demonstrate the importance they placed on tax benefits.[9] *See* Root, Executive Summary at 2 (noting that CTC "agreed to pay to FSLIC, for 10 years in cash, 22.5% of the net income before taxes of New Lyons."); Price Waterhouse Evaluation at 7 ("In lieu of tax benefit sharing, the Assistance Agreement includes a 10–year income sharing agreement under which Superior will pay to FSLIC 22.5% of Superior's net income before deduction for federal and state income taxes."); the FHLBB "Fact Sheet" (stating that CTC "agreed to pay FSLIC, for 10 years, in cash, 22.5 percent of the net income before taxes of Lyons Savings Bank. This income sharing substitutes for tax benefit sharing."); Supplemental Plan (containing a ten-year income projection which included annual line items entitled, "In lieu of payments—FSLIC"); April Proposal at 14 ("[A] condition of this proposal is a determination by Coast–To–Coast's tax advisor that Lyons' 'loss carryforwards' will transfer to Coast–To–Coast without reductions as a result of the merger."); Letter from Held to Johnigan of 05/16/88, at 2 ("[A]ll yield subsidy pay-

ments to be refunded to FSLIC. Then, to the extent there are additional gains, these gains will be shared 80% to FSLIC, 20% CTC, up to total gains of $5 million, FSLIC's share to decline by 5% for each subsequent $5 million in total gains."); June Proposal at 14 (CTC's revised tax benefits proposal offering to "reimburse FSLIC for *50 percent of* any cash savings realized from the reduction of federal taxes to the extent the reduction was a direct result of Lyons' *pre-acquisition* net operating loss carryforwards as of the date of acquisition, tax free FSLIC yield coverage *or the tax free interest payments on the FSLIC note*."); and September Proposal at 14 (CTC's proposal of an "in lieu of tax calculation").[10]

Under similar circumstances, in *First Nationwide Bank v. United States ("First Nationwide II")*, 49 Fed.Cl. 750 (2001), we held that the Guarini legislation constituted a breach of contract. We considered whether the "benefits derived from the covered asset loss deduction constituted a benefit of the parties' bargain," despite the fact that the assistance agreement did not "refer to the sharing of tax benefits derived from the covered asset loss deduction upon realization of those benefits." 49 Fed.Cl. at 754.

The *First Nationwide* agreement provided that assistance payments made by FSLIC to plaintiffs would be reduced by ten percent, but did not expressly state " '[T]he FSLIC shall provide ninety percent reimbursement for covered asset losses.' Rather, the Assistance Agreement provide[d] for the payment of the 'After–Tax Amount.' " *Id.* The parties valued the "After–Tax Amount" as one minus the designated tax rate of ten percent, or ninety percent. *Id.* The government argued

9. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972): [M]eaning can usually be given to a writing only on consideration of all the circumstances, including the prior negotiations between the parties. The parol evidence rule is therefore no bar to the use of the oral statements of the parties during negotiations, in aid of the interpretation of ambiguous or uncertain clauses in written agreements. Expressions of the parties during negotiations for the contract are thus a frequent source for interpretation of its text.

(Citing RESTATEMENT, CONTRACTS §§ 238, 230, 231 (1932); 3 CORBIN, CONTRACTS §§ 543, 579 (1960)) (citations omitted).

10. CTC cites the depositions of several of their officers and advisors for this point, as well. As noted earlier, we lend less credence to what these interested parties have to say about the importance of tax benefits after the breach of contract than we give to pre-breach documents pertaining to the subject.

that, as plaintiffs' tax rate was ten percent, the "After–Tax Amount" equaled ninety percent and the agreement contained no express provision concerning the covered asset loss deduction. *Id.*

We disagreed, noting that "defendant's argument does not explain why the parties used the term 'After–Tax Amount.' If defendant is correct, the figure ninety percent could have been used without reference to an 'After–Tax Amount.'" *Id.* We turned to the parties' negotiations to determine why the "After Tax Amount" was included in the agreement and concluded that "[t]here can be no question that the parties used the term 'After–Tax Amount' because they understood that the reduction in assistance payments was the mechanism by which the tax benefits derived from the covered asset loss deduction would be shared." *Id.* at 754–55. Because the division of the covered asset loss deduction was part of the contract, the government's obligations under the implied covenant of good faith and fair dealing mandated that it not eliminate the deduction out of financial self-interest because, by doing so, it would improperly use its non-contractual powers to target one of the benefits plaintiffs were to receive under the contract. *Id.* at 755. We determined that, if the obligation were not present, the contract would be illusory. *Id.* Therefore, as the benefits derived from the covered asset loss deduction were a fruit of plaintiffs' contract, the implied obligation protected them from elimination by the Guarini legislation. *Id.*

The government subsequently enacted the Guarini legislation. As we held previously in *Centex II,* because this "targeted, retroactive legislation ... deprived plaintiffs of the very benefits for which they had contracted, the United States breached the contract's implied covenant of good faith and fair dealing." 49 Fed.Cl. at 708. We further noted:

> When the parties to the contract here agreed to a fifty-fifty split of the benefits derived from the covered asset loss deduction, that ratio, as a matter of contract, was fixed. It is indisputable that neither party was then at liberty to alter the ratio unilaterally without becoming liable for damages. Here, however, the essence of

defendant's argument is that it cannot be held liable in contract for targeting and retroactively eliminating plaintiffs' opportunity to utilize those tax benefits because (1) the Guarini legislation did not technically alter the ratio prescribed by the contract and (2) the Government made no express promise that a deduction for covered asset losses would continue to exist. We reject defendant's argument.

> The contract contained terms requiring the FSLIC to reimburse plaintiffs for covered asset losses, requiring plaintiffs to maximize any tax benefits, and requiring plaintiffs to share with the FSLIC any tax benefits derived from the deduction of covered asset losses. These substantive obligations created a contractual superstructure that rested on the parties' mutual assumption of a deduction for covered asset losses.

*Id.* (footnote omitted).

The government enacted the Guarini legislation specifically to withdraw the very benefit that it offered to CTC in the first place— the opportunity to take advantage of FSLIC's special tax benefit provisions—in order to avoid fulfilling its end of the bargain. In evaluating the *Centex* plaintiffs' nearly identical claim, we said:

> There can be no meaningful debate about what occurred. The parties to the Assistance Agreement understood that the "double dip" was available and that this special tax incentive, along with others, was what made the agreement desirable to plaintiffs. Government negotiators understood that motivation and specifically constructed the Assistance Agreement to take advantage of those benefits for the United States. These negotiators were more than willing to market the "perverse incentives" Congress had made available when they were eager to have plaintiffs take over responsibility for failing thrifts. However, having, at the very least, delayed its liability to the depositors of the problem thrifts, the United States almost immediately sought, using its unique sovereign powers, to deprive plaintiffs of the tax benefits previously negotiated. In enacting targeted, retroactive legislation that deprived

plaintiffs of the very benefits for which they had contracted, the United States breached the contract's implied covenant of good faith and fair dealing.

*Id.* at 707–08 (footnote omitted).

■■■ It is elementary that "every contract has an implied condition that 'neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.'" *Petrofsky v. United States,* 222 Ct.Cl. 450, 616 F.2d 494, 497 (1980) (quoting *Petrofsky v. United States,* 203 Ct. Cl. 347, 488 F.2d 1394, 1404 (1973)). When the government is one of the parties, it "impliedly promises to act in good faith and 'invoke its great power of a sovereign act when and only when and to the extent necessary to carry out its essential governmental functions.'" *Hughes Communications Galaxy, Inc. v. United States,* 26 Cl.Ct. 123, 140 (1992) (quoting *Air Terminal Servs., Inc. v. United States,* 165 Ct.Cl. 525, 330 F.2d 974, 981 (1964) (Jones, C.J., dissenting)), *rev'd on other grounds,* 998 F.2d 953 (Fed.Cir.1993). Here, the government invoked its sovereign power to take away the benefit of the bargain it made with CTC, thus breaching its implied promise to act in good faith.

The fact that the Guarini legislation affected the tax laws is irrelevant to our analysis. Discussing the division of tax benefits between the parties in *Centex II,* we noted that

> It would be inconceivable that there was not, implicit in the Government's agreement to accept only fifty percent of the benefits derived from the covered asset loss deduction, the good faith promise that the Government would not exercise its taxing power, in a way targeted at this particular contract and ones similar to it, to eliminate the means by which the benefits were generated and thereby divert to itself one hundred percent of the benefits.

49 Fed.Cl. at 708–09.

The government exercised its unique sovereign powers to deprive CTC of what would otherwise have been its rights under general tax laws. If this change had been general in nature—i.e., not motivated by financial self-interest—CTC could not complain. But the record makes it painfully clear that the repeal was specifically intended to take away from CTC and a small, similarly-situated group of the government's contracting partners the benefits they had contracted for. The government thereby breached the agreement.

*Prior Material Breach*

■ The government asserts in its October 19, 2001 supplemental counterclaim that Superior Bank committed a material breach prior to the enactment of the Guarini legislation, thereby excusing the government of any subsequent breach. The alleged material breach is that CTC ceased making PIL payments to the SRA; that when the Agreement terminated on December 30, 1998, the proper SRA balance in favor of FDIC exceeded $11 million. Because plaintiffs dispute the facts behind the defense, defendant believes that, at a minimum, its counterclaim raises a genuine issue that precludes summary judgment: whether CTC breached the Agreement prior to Guarini's enactment in 1993. The government asserts its counterclaim only against Superior. It does not allege that any of the investor plaintiffs neglected to make any required payment or accounting entry into the SRA or that they guaranteed Superior's performance or bore a shared obligation to make payments.

The defense is theoretically available. In *First Heights,* we noted that

> It is well settled that "[w]here there has been a material failure of performance by one party to a contract, so that a condition precedent to the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform."

51 Fed.Cl. 659, 663 (2001) (quoting 14 WILLISTON ON CONTRACTS § 43:15 (4th ed.2000)). We rejected the defense in *First Heights,* however, in part because FDIC accepted payment of a note with knowledge that the thrift acquirer had already breached the assistance agreement. 51 Fed.Cl. at 665–66.

Disagreement over whether Superior failed to sufficiently credit the SRA does not preclude rejection of the defense in this case. The undisputed facts demonstrate that, as a matter of law, the defense does not apply.

In *Cities Service Helex, Inc. v. United States,* the Court of Claims stated:

A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

211 Ct.Cl. 222, 543 F.2d 1306, 1313 (1976) (footnote omitted). The court identified four approaches to evaluating whether a party's conduct precludes it from asserting prior material breach as a defense:

(1) a strict approach, under which "any act indicating an intent to continue the contract is an election ... [and] the right to end the contract [is lost]," (2) a modified approach, under which "the injured party may itself continue performance in certain circumstances and yet reserve its right to claim material breach without the breaching party's assent," (3) Professor Corbin's approach, under which "an election should not be conclusive unless facts giving rise to an estoppel exist[:] either the breaching party must have changed his position in reliance on the injured party's failure to cancel or the injured party's conduct must be such that it would be unjust to allow him to change his position," and (4) the Uniform Commercial Code approach, under which the question of "[w]hether the pursuit of one remedy bars another depends entirely on the facts of the individual case."

*First Heights,* 51 Fed.Cl. at 664 (quoting *Cities Serv. Helex,* 543 F.2d at 1313–14).

The SRA was an ongoing account. There is no dispute that the government accepted credits to the SRA, paid certain "subsidiary" and "technical assistance" expenses, and audited the SRA several times from 1990–96, all according to the Agreement. Def.'s Answer to FDIC's First Amended Compl. and Supplemental Countercl. at ¶¶ 278, 280, 284–85, 287–88, 290. These actions indicate that the government continued performance under the contract despite perceived material breaches by Superior. CTC relied on the government's failure to cancel the contract by continuing to make payments to the SRA. The Agreement terminated by its own terms in 1998, despite the government's argument that the investor plaintiffs breached it years before. The government did not reserve any claim of prior breach and did not bring up the question until long after this litigation commenced. Under any construction of the applicable law, the government's actions preclude it from raising the defense.

*FDIC's Motion for Partial Summary Judgment*

■ Like CTC, FDIC requests summary judgment on the grounds that the passage of the Guarini legislation constituted a breach of the implied covenant of good faith and fair dealing. As a preliminary matter, however, we must address defendant's argument that FDIC's claim does not present a "case or controversy" because any payment to the FDIC would, in effect, constitute a payment by the government to itself. Defendant relies on the Federal Circuit decisions in *Landmark Land Co. v. F.D.I.C.,* 256 F.3d 1365 (Fed.Cir.2001), and *Glass v. United States,* 258 F.3d 1349 (Fed.Cir.2001), in which the FDIC was dismissed on that basis.

In *Landmark,* the Federal Circuit held that "where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied." 256 F.3d at 1382. The government argues that, in this case, FDIC's damage claim is necessarily less than the $500 million required to pay off Superior Bank's depositors. *See* Kathleen Day, *Families Feud*

*Over Failed Bank; Pritzkers Deny Co–Owner's Version of How He Got $130 Million Loan*, WASH. POST, August 7, 2001, at 1, *available at* 2001 WL 23185144 ("Federal regulators closed the bank July 27 at an estimated cost of $500 million to the Federal Deposit Insurance Corp., which insures depositors up to $100,000 each. Regulators say as many as 1,000 customers could lose $43 million in uninsured deposits."); Kathleen Day, *Failed Bank's Regulators to Call In IRS*, WASH. POST, August 9, 2001, at 1, *available at* 2001 WL 23185463 ("The OTS and the FDIC are investigating the events that led to the bank's collapse, which will cost the FDIC an estimated $500 million and could cause as many as 1,000 customers to lose a total of $43 million in uninsured deposits.").

As the FDIC points out, however, the result in *Landmark* was predicated on the agency's standing in that case. It was presenting claims as a plaintiff on behalf of the FRF fund. As the Federal Circuit held, the result was that:

> Even if the FDIC were to have won a judgment for the entire amount it was seeking, however, none of the money paid by the government in satisfaction of such a judgment would leave the government.
>
> . . . .
>
> It is undisputed that no private creditors could benefit even if the FDIC were to fully recover on its claims in this case. . . . Thus, even if the FDIC were to fully recover, all proceeds from the judgment would be paid out of the FRF, and then distributed by the FDIC right back into the FRF. Critical to the issue of standing, then, is the fact that adjudication of the FDIC's claim cannot affect any party other than the government.

256 F.3d at 1380–81.

In this case, by contrast, FDIC appears only as Receiver of Superior, a SAIF-insured

institution, not as Manager of FRF–RTC (the FDIC-managed fund which holds all funds held by the now-terminated RTC, *see* 12 U.S.C. § 1441a(m)(1)-(2)). As Receiver, "the FDIC is not the United States." *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Accordingly, FDIC argues, in this case any recovery by it would be paid from the Treasury-funded FRF–FSLIC to FDIC as Receiver for Superior for distribution to the Superior Receivership's creditors pursuant to the statutory system. *See, e.g.*, 12 U.S.C. § 1821(d)(11). The principal creditors of the Superior receivership estate are the SAIF and Superior's uninsured depositors. This distinguishes the facts from *Landmark*, therefore, in which the court anticipated that:

> The existence of two distinct funds within the FRF could be relevant if depletion of one of the funds would either prevent third-party creditors from recovering on claims against the FRF, or increase the total amount of the government's liability. The FDIC, however, has not shown this to be the case.

256 F.3d at 1381.

Even if the SAIF could be characterized as a government entity, something which defendant suggests and the court does not accept,[11] the facts are still distinguishable from *Landmark* and *Glass*, where the recovery would be paid from and to the same government-controlled fund. The circumstances are more closely aligned with those in *Tennessee Valley Authority v. United States* ("*TVA*"), 51 Fed.Cl. 284 (2001), in which we also were called upon to construe *Landmark* and *Glass*. The government argued that the action should be dismissed because there was no "case or controversy," as the Tennessee Valley Authority ("TVA"), an "independent

---

11. SAIF exists primarily to insure the deposits of its member institutions, including Superior, 12 U.S.C. § 1817(1)(3)(B), which are predominantly OTS-supervised savings associations. 12 U.S.C. § 1821(a)(6)(B) ("[SAIF] shall be available to the Corporation for use with respect to [SAIF] members."). Although the Treasury was apparently exposed to potential liability from 1994–98 under section 1821(a)(6)(D), defendant is unable to challenge FDIC's assertion that, in fact, SAIF has never received federal funds; it has been funded entirely by assessments of member institutions. 12 U.S.C. §§ 1821(a)(6)(C), 1817(b)(2)(A)(i). If the reserve ratio falls below the ratio set forth in section 1817(b)(2)(A)(iv), then the FDIC Board of Directors "shall set semiannual assessment rates for members ... that are sufficient to increase the reserve ratio for that fund to the designated reserve ratio." 12 U.S.C. § 1817(b)(3)(A)(i).

government corporation," occupied "both sides of the case caption." *Id.* at 284–85.

We denied the motion, finding that "TVA's fundamentally separate and independent nature," as evidenced by its authority to sue to enforce contracts, its independent litigating authority, and its financially self-supportive character requiring it to "make up any revenue shortfall from its rate base," made the case justiciable. *Id.* at 286. We found that:

> In the case at bar, it is plain that there exists a concrete controversy between adverse parties. This is not a fight over policy. It is a dispute over money—a circumstance virtually guaranteed to break up family harmony. Who will absorb the cost of [the Department of Energy's] failure to perform the contract, the Treasury, or TVA's rate payers? This commercial nature of the controversy-a traditional breach of contract claim seeking money damages-makes more significant the ways in which TVA is independent. TVA can contract, sue and be sued, and represent itself in court. Those aspects of independence are precisely the characteristics implicated here.

*Id.*

FDIC has the right to sue and enforce contracts, has independent litigating authority, and is financially self-supporting. 12 U.S.C. § 1819(a). More importantly, its rights to recover and its obligation to pay any recovery are not merged. We agree with the agency that its case on behalf of Superior is justiciable.

The substance of FDIC's motion and defendant's responses to it are identical to CTC's. Accordingly, our holding is the same: the enactment of the Guarini legislation constituted a breach of contract.

## CONCLUSION

CTC's and FDIC's motions for summary judgment are granted. The government's cross-motion is denied. The government's motion to compel and for an extension of time for discovery is granted. CTC is directed to produce every document in its possession, custody, or control concerning Coast–To–Coast Financial Corporation that is rele-vant to the government's counterclaim and that is not privileged. CTC is not required to produce any documents that it has already furnished to FDIC. Our August 24, 2001 order is amended as follows: discovery relating to the counterclaim shall be concluded on or before July 18, 2002.