**COAST–TO–COAST FINANCIAL CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–525C.

United States Court of Federal Claims.

Oct. 31, 2003.

---

Melvin C. Garbow, Washington, D.C., for plaintiffs Coast–To–Coast Financial Corporation. With him on the briefs were Howard
N. Cayne, Kent A. Yalowitz, Edward Sisson, and Todd A. Wynkoop, all of counsel.

Glenn I. Chernigoff, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Scott D. Austin, Paul G. Freeborne, Jeffrey T. Infelise, Brian A. Mizoguchi, and Brian L. Owsley, all of counsel.

## OPINION

BRUGGINK, Judge.

Pending is plaintiff's motion for partial summary judgment on liability on its *Winstar*[1]-related cause of action. Familiarity with the *Winstar* line of cases is presumed. Oral argument was held on October 30, 2003.[2] In *Coast–To–Coast Financial Corp. v. United States*, 52 Fed.Cl. 352 (2002), we granted plaintiff's motion for partial summary judgment on liability as to its Guarini "tax benefits" claim.

## BACKGROUND

This case arises from the supervisory takeover of Old Lyons, a federally chartered mutual association that became insolvent during the Savings and Loan crisis of the 1980's. The Federal Home Loan Bank Board ("FHLBB") appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver for Old Lyons, and transferred its assets and liabilities to a new mutual association, Lyons Savings, a Federal Savings and Loan Association, which was later renamed Superior Bank, FSB. The thrift's financial troubles continued, and so FSLIC sought a healthy thrift or holding company to acquire Lyons. To facilitate such an arrangement, FSLIC issued a document entitled "Information and Instructions

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Immediately prior to oral argument defendant notified the court that it was limiting its defenses to the following: (1) the assumption by Coast–to–Coast through the forbearance letter and the

dividend restriction agreement of the risk of regulatory change; and (2) the failure of Coast–to–Coast to demonstrate that a contract existed respecting long-term amortization by Superior Bank of its identifiable deposit base intangible assets.

for Preparation and Submission of Proposals for the Acquisition of: Lyons SA, a FS & LA Countryside, IL" ("RFP"). The RFP contained a section entitled "Accounting Issues," which provided, inter alia, that:

> The proposal submitted must provide a statement from the offeror's independent accountants justifying the accounting treatment (pooling or purchase and push-down accounting if utilized), the estimated amount of unidentified intangible assets (goodwill) to be created, and the estimated amortization period (no longer than 25 years).

RFP ¶ 24. Included along with the RFP was Memorandum SP–37(a), a document that contained a list of forbearances available to potential acquirers of Lyons. SP–37(a) provided that, in connection with an acquisition by a holding company or individual, the use of "push-down accounting" had to be proven to be in conformity with generally accepted accounting principles.

In March of 1988, FSLIC sent a copy of the RFP to the investors who would eventually form plaintiff Coast–To–Coast Financial Corporation ("CTC"). On April 11, 1988, CTC submitted a bid for Lyons. In its first proposal, CTC included an "Accounting Issues" section which provided:

> for purposes of reporting to the Board, the value of any intangible asset resulting from the application of push-down accounting for the purchase, may be amortized by Lyons over a period not to exceed 25 years by the straight-line method.

Coast–To–Coast Financial Corp., Proposal to Acquire Lyons Savings (April 11, 1988). With regard to the RFP's requirement that proposals include a statement from the offeror's independent accountants justifying the accounting treatment, CTC's first proposal also included the following request:

> Since due diligence is requested under XI., we request an extension to supply this opinion until such time as that process is complete. It is, however, contemplated that as a newly formed holding company the only appropriate accounting for the transaction would be purchase accounting and that pushdown accounting to the institution would be appropriate.

*Id.* The above language is repeated, verbatim, in each of the Accounting Issues paragraphs of CTC's subsequent Amended Proposals. *See* Coast–To–Coast Financial Corp., Amended Proposal to Acquire Lyons Savings (June 23, 1988); Coast–To–Coast Financial Corp., Amended Proposal to Acquire Lyons Savings (Sept. 26, 1988); Coast–To–Coast Financial Corp., Amended Proposal to Acquire Lyons Savings (Oct. 27, 1988); Coast–To–Coast Financial Corp., Amended Proposal to Acquire Lyons Savings (Nov. 24, 1988).

On December 30, 1988, the FHLBB held a meeting at which it adopted several resolutions approving the terms of CTC's final bid proposal. Specifically, FHLBB Resolution No. 88–1552P contained a section entitled "Accounting," which stated:

> [T]he Acquisition and the Merger shall be accounted for, and New Federal shall report to the Bank Board and the FSLIC, in accordance with generally accepted accounting principals prevailing in the savings and loan industry ... except as may be provided in the Forbearance Letter; and ... New Federal shall furnish an analysis, accompanied by a concurring opinion from its independent certified public accountants ... which shall (a) specifically describe, as of the Effective Date, any intangible assets, including goodwill and the discount and premiums, and the related amortization periods and methods ....

FHLBB Res. No. 88–1552P (Dec. 30, 1988).

Pursuant to Resolution No. 88–1552P, and as part of its agreement with CTC, FSLIC executed an Assistance Agreement ("Agreement"), dated December 30, 1988. CTC, Lyons, and FSLIC were all signatories to the Agreement. Under the Agreement, Superior became a wholly-owned subsidiary of CTC, and in return, CTC was provided with financial assistance, including: (1) a FSLIC promissory note in the principal amount equal to negative regulatory capital, less $10 million; (2) a cash payment or FSLIC promissory note(s) in an amount equal to difference between book value and fair market value of certain assets, and liabilities less $14 million; (3) a reimbursement for losses resulting from capital losses on covered assets,

and write-down of covered assets and for certain related costs and expenses; (4) a guaranteed yield on certain covered assets; (5) indemnification for certain unreserved claims against Lyons and litigation challenging the transaction; and (6) indemnification for expenses of pursuing related claims. The Agreement expressly conditioned FSLIC's obligations under the contract on five requirements, including, inter alia, "[t]he capitalization of [Lyons] by [CTC] with cash in the amount equal to $42,500,000" and "the execution and delivery of ... this Agreement and any other agreements or instruments executed by the acquirer." *Id.* § 2.

Section 20 of the Agreement was entitled "Accounting Principles." It provided as follows:

> Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry; except that where such principles conflict with the terms of the Agreement, applicable regulations, or any resolution or action of the Bank Board approving or relating to the Transaction or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern .... If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Transaction or to this Agreement, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations and accounting principles shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization of the American Institute of Certified Public Accountants.

*Id.* § 20.

Section 26 of the Agreement contains an integration clause, providing that:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection

with it, excepting only the Stock Purchase Agreement and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the Corporation in connection with the approval of the Transaction and this Agreement ....

*Id.* § 26.

In connection with the acquisition, CTC, Lyons, and FSLIC entered into a Voting and Disposition Rights/Dividend Agreement ("Dividend Agreement"), ostensibly for the purpose of protecting the deposit insurance fund by setting a limit on CTC's ability to cause New Lyons to upstream dividends to CTC. The Dividend Agreement also required CTC to deliver an irrevocable proxy to FSLIC, which, if CTC failed to maintain the regulatory capital of the new thrift at a level required by the Dividend Agreement, would allow FSLIC to control the shares of New Lyons.

Pursuant to the Accounting Principles section of Resolution No. 88–1552P, the FHLBB issued a Forbearance Letter to CTC, dated January 3, 1989, which stated:

> In connection with the approval by the Federal Home Loan Bank Board ("Bank Board") of the involuntary supervisory stock conversion of Lyons Savings ... the following regulatory forbearances are hereby granted:
>
> ....
>
> 7. For purposes of reporting to the Bank Board, the value of *any intangible asset* resulting from the application of push-down accounting in accounting for the purchase may be amortized by Lyons over a period not to exceed 25 years by the straight-line method.

Letter from Nadine Washington, Assistant Secretary, FHLBB, to Sandra K. Johnigan, President, Coast–To–Coast Financial Corporation (Jan. 3, 1989) (emphasis added). Plaintiff calls attention to the italicized language in the Forbearance Letter set out above as an unambiguous agreement on the part of the regulators that intangible assets could be amortized and deducted irrespective of how they might be characterized by SP37(a).

For its part, defendant points to the following language in the concluding paragraph of the Forbearance Letter:

> In the event any regulation or statute referred to herein is amended or succeeded by another statute, regulation or rule, then any reference to any such regulation or statute shall be deemed to refer to such regulation or statute as amended or the statute, regulation or rule which succeeds any such regulation or statute.

It is the government's position that this caveat shifted to plaintiff the risk of regulatory change. Defendant believes that this argument is also supported by similar language in the Dividend Agreement.

## DISCUSSION

Plaintiff argues that, as part of the overall agreement, defendant promised, among other things, to permit the thrift to count supervisory goodwill toward minimum regulatory capital requirements and to amortize intangible assets, including supervisory goodwill, over a period of up to 25 years. Plaintiff alleges that based on this agreement, Superior booked supervisory goodwill totaling approximately $23.8 million, and later was prepared to included that goodwill in computing its regulatory capital. Less than a year after the transaction was consummated, on August 9, 1989, the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. 101–73, 103 Stat 183, was enacted. Pursuant to FIRREA, new and stricter regulatory capital requirements were imposed, which, over time, eliminated the use of supervisory goodwill as tangible capital and limited the amount that could be counted towards an institution's minimum core capitalization.

Plaintiff's primary argument is that the language in the documents discussed above is so similar to language found in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), *Home Savings of America v. United States*, 50 Fed.Cl. 427 (2001), and other similar cases, that we should find, as we did in *Home Savings*, that one of the

elements of the agreement here was that approximately $24 million in supervisory goodwill could be claimed as satisfying certain capitalization requirements, and that we need not make further factual findings in order to rule in favor of plaintiff on the issue of liability.

Defendant offers two defenses. First, that CTC has failed to prove with undisputed evidence that there was a meeting of the minds with respect to the long-term amortization by Superior of its identifiable deposit base intangible assets. Second, that the forbearance letter and the dividend agreement reflected an understanding that plaintiff assumed the risk of regulatory change.[3]

### I. Contract Formation

■ Defendant argues that summary judgment is inappropriate as to whether there was a meeting of the minds with respect to the precise characterization of the assets included within the FHLBB forbearance. Specifically, it is defendant's argument that, either the elements comprising supervisory goodwill were never agreed to, or that the contract is so ambiguous that parol evidence as to intent should be admitted to establish meaning. Defendant points to *California Federal Bank v. United States*, 245 F.3d 1342 (Fed.Cir.2001), for the proposition that a definitive offer by one party and an unconditional acceptance by the other must be established to show an express or an implied-in-fact contract. According to defendant, there is evidence that regulators held the view that only "unidentified" intangible assets qualified for forbearance, while CTC believed that "identified" intangible assets would also qualify.

On its face, the Forbearance Letter itself appears clear: "the value of *any* intangible asset resulting from the application of pushdown accounting in accounting for the purchase may be amortized by Lyons over a period not to exceed 25 years" (emphasis added). The distinction that defendant wants to make between "unidentified" intangibles and "identified" intangibles thus does

**3.** Defendant originally challenged CTC's standing to bring suit under the acquisition agreement but    conceded that issue prior to oral argument.

not appear to arise from the Forbearance Letter itself, which both parties accept as part of the contract.

Defendant argues, however, that the agreement must be read in light of pre-contractual documents, including the RFP, FHLBB Memorandum SP–37(a), and one of CTC's early proposals to acquire Lyons. Because the accounting principles referenced in those documents distinguish between "unidentified" and "identified" intangibles, and the manner in which they are amortized, defendant contends that the parties did not come to a meeting of the minds as to amortization of goodwill. We disagree.

■ The Federal Circuit has made it clear that "extrinsic evidence will not be received to change the terms of a contract that is clear on its face." *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988); *see also First Heights Bank, FSB v. United States,* 51 Fed.Cl. 659, 666 (2001). We believe the agreement here is quite clear in allowing plaintiff to amortize the value of *any* intangible asset, whether "identified" or "unidentified." The integration clause itself makes it plain that the parties explicitly agreed that pre-contractual documents would have no binding effect. "This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supercedes all prior agreements and understandings . . . ." Those preliminary materials were merged into the final agreement which, in this respect, is reflected by the Forbearance Letter.

## II. Assumption of Risk of Regulatory Change

■ Defendant's next argument is that the Dividend Agreement and the Forbearance Letter reflect an understanding that CTC agreed to be bound by successor regulations—*i.e.,* it assumed the risk that the forbearance could be altered at any time. Specifically, defendant points to the following provision:

All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

In return, argues defendant, FSLIC agreed that Superior Bank could pay dividends of at least 50 percent of its income, as defined, to CTC so long as Superior Bank maintained a specific level of regulatory capital. It is argued that these reciprocal promises were just as much a part of the bargained-for exchanges as any of the other promises contained, or integrated, in the Agreement. Moreover, defendant points out that in the Dividend Agreement, the definitions of "Fully Phased In Capital Requirement" and "Total Liabilities" include "any successor regulation." *Id.* at 2–3. Similar language appears in the Forbearance Letter:

In the event any regulation or statute referred to herein is amended or succeeded by another statute, regulation or rule, then any reference to any such regulation or statute shall be deemed to refer to such regulation or statute as amended or the statute, regulation or rule which succeeds any such regulation or statute.

Defendant argues that the Supreme Court in *Winstar,* in a footnote, endorsed a similar view that such language shifts the risk of regulatory change to the acquirer:

To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. *See, e. g., Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994, 999–1000 (C.A.11 1991) (finding, based on very different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift). . . . [4]

4. We note, however, that the Court went on to say that "few contract cases would be in court if contract language had articulated the parties' postbreach positions as clearly as might have

been done, and the failure to specify remedies in the contract is no reason to find that the parties intended no remedy at all. . . ." *Winstar,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432.

*Winstar,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432; *see also Guaranty Fin. Serv., Inc. v. Ryan,* 928 F.2d 994 (11th Cir.1991). Once again, we disagree with defendant.

Defendant's argument has been raised and rejected repeatedly in the past. In *California Federal Bank v. United States,* 39 Fed. Cl. 753 (1997), the court rejected defendant's "successor regulation" argument, quoting Justice Scalia's concurrence in *Winstar* that "[i]f ... the Government committed itself only 'to provide [certain] treatment unless and until there is subsequent action' ... then the Government in effect said 'we promise to regulate in this fashion for as long as we chose to regulate in this fashion'—which is an absolutely classic description of an illusory promise." *Id.* at 777–78 (quoting *Winstar,* 518 U.S. at 921, 116 S.Ct. 2432).

Nearly identical language was examined in *Admiral Financial Corp. v. United States,* 54 Fed.Cl. 247 (2002), and *Hometown Financial, Inc. v. United States,* 53 Fed.Cl. 326 (2002). In both cases similar arguments by the government were rejected. *Admiral Fin. Corp.,* 54 Fed.Cl. at 256; *Hometown Fin.,* 53 Fed.Cl. at 336–37. We agree with those courts and believe the government's interpretation of the "successor regulation" language would render those elements of the agreement illusory. Moreover, we believe the reference to the succeeding amendment of law and regulation is directed at those specific provisions mentioned in the contract papers which were not the subject of forbearance.[5]

Although arguably abandoned, we have considered other arguments defendant originally raised and find them unpersuasive.

## CONCLUSION

■ Plaintiff's motion for summary judgment as to liability on its *Winstar* claim is granted. The government promised, among other things, to permit the acquired thrift to count supervisory goodwill toward minimum

regulatory capital requirements and to amortize intangible assets, including supervisory goodwill, over a period of up to 25 years. This promise was breached by the enactment of FIRREA. Plaintiff is entitled to attempt to prove damages. Plaintiff is instructed to file a motion for summary judgment as to damages on or before January 16, 2004.

---

5. Furthermore, we believe that the situation presented in *Guaranty* is distinguishable. Here, the Dividend Agreement itself limited Superior's ability to pay dividends if such payment "would cause [Superior's] Regulatory Capital to fall below its Regulatory Capital Requirement *after*

giving effect to the forbearance provided [*in the Forbearance Letter*]," Dividend Agreement at 5 (emphasis added), providing that the forbearances took precedence regardless of any regulatory change. This was not the case in *Guaranty.*