FIRST HEIGHTS BANK, FSB,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–811C.

United States Court of Federal Claims.

Aug. 16, 2001.

**660**

Robert K. Huffman, Washington, D.C., for plaintiffs. Alan I. Horowitz, Lisanne E.S. Cottington, and Brad Rosenberg, of counsel.

Jeffery T. Infelise, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Paul G. Freeborne, Glenn I. Chernigoff, and Scott D. Austin, of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related [1] case are defendant's March 26, 1997, Motion for Partial Dismissal; [2] that part of defendant's March 16, 1999, Motion for Summary Judgment on "Tax Benefit" Claims not disposed of in our February 12, 2001, order; plaintiffs' March 23, 2001, Renewed Cross Motion for Summary Judgment on Liability; [3] and defendant's RCFC 56(g) request for discovery. Oral argument was held on June 29, 2001,[4] after which additional briefing was ordered with respect to the Government's prior material breach defense. That issue was re-argued on August 15, 2001. For the reasons set forth below and in *Centex Corp. v. United States,* 49 Fed.Cl. 691 (2001), defendant's Motion for Partial Dismissal is denied in part as moot; the remainder of defendant's Motion for Summary Judgment is denied; plaintiffs' Renewed Cross Motion for Summary Judgment on Liability is granted with respect to count I and denied with respect to count II; and defendant's RCFC 56(g) request is denied.

## BACKGROUND [5]

This case, like *Centex,* is one of the five pending "tax benefit" cases. Like the plain-

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Consideration of this motion was suspended after the case was transferred to this judge in 1998. *See* Order of May 21, 1998.

3. In our February 12, 2001, order, we considered defendant's March 16, 1999, Motion for Summary Judgment on "Tax Benefit Claims" and plaintiffs' September 22, 2000, Cross–Motion for Summary Judgment on Liability. Defendant's Motion for Summary Judgment was granted in part in that we found (1) that plaintiffs' assistance agreement, within its four corners, did not contain a promise that a deduction for covered asset losses would continue to exist and (2) that, if such a promise had been made, it would have been unauthorized. The remainder of defendant's motion was left pending, and we address that remainder here. Plaintiffs' Cross–Motion for Summary Judgment on Liability was granted in part in that we found that a deduction

for covered asset losses existed as a matter of law at the time the contract was entered into. Plaintiffs' Cross–Motion was otherwise denied without prejudice.

4. The June 29, 2001, oral argument in this case was held in conjunction with oral argument in *Centex Corp. v. United States,* 49 Fed.Cl. 691, and *First Nationwide Bank v. United States,* No. 96–590C, because the three cases presented several of the same issues.

5. The relevant facts are undisputed, making the issues presented here appropriate for summary judgment. We also refer the reader to our July 6, 2001, opinion in *Centex* for background regarding Congress's activities that are matters of public record. For reasons we discuss in part IV of our discussion section, we need not recite the facts regarding actions taken by the FDIC that plaintiffs allege were designed to encourage passage of the Guarini legislation.

tiffs in *Centex*, plaintiffs here, First Heights Bank, FSB, Pulte Diversified Companies, Inc., and Pulte Corporation, (collectively "Pulte") allege having entered into an assistance agreement ("Assistance Agreement") with the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") in 1988 in connection with plaintiffs' acquisition of a package of several failing thrifts marketed by the FSLIC and the FHLBB as part of the FSLIC and FHLBB's Southwest Plan.

The statutory backdrop to this transaction is identical to that of *Centex*. Also like the assistance agreement in *Centex*, the Assistance Agreement here was, in part, built on the assumption of a deduction for covered asset losses.[6] We have already held that this deduction existed as a matter of law at the time the Assistance Agreement was entered into. *See* Order of February 12, 2001.

The relevant actions taken by Congress prior to 1988 in regard to the thrift industry are detailed in our July 6, 2001, opinion in *Centex* and are a matter of public record. We do not repeat that discussion here but rather turn directly to a recitation of the facts surrounding the negotiation of the Assistance Agreement in question here.

Pulte received the same Request for Proposals ("RFP") received by plaintiffs in *Centex*, and we refer the reader to our July 6, 2001, opinion in that case for the relevant text of the RFP. On March 31, 1988, Pulte submitted a proposal for a package of five thrifts, known as the OWL package, in response to the RFP.[7] Pulte submitted a term sheet to the FSLIC on May 31, 1988. Responding to this term sheet, John Henry, the

FSLIC's lead negotiator for the OWL package, informed Pulte that the term sheet was "unacceptable and that FSLIC wanted 100% of the benefits arising from NOLs, built-in losses [i.e. covered asset losses], and indemnification, and no less than an 80–20 split on benefits from interest payments on the Note and Yield Maintenance Payments."

Negotiations continued into July 1988. On July 28, Mr. Henry met with Pulte representatives. The tax benefit discussion "involved the most extensive discussion of the meeting."[8] Pulte, on August 8, submitted a revised term sheet. Pulte offered the FSLIC a 25% share of tax benefits on a "global" basis.[9] Government documents indicate that Pulte provided the FSLIC with a tax benefit sharing analysis that showed that the FSLIC's 25% share of tax benefits on a "global" basis would be approximately $3 million per year over 10 years.[10]

Shortly before the transactions closed, the FSLIC changed one of the institutions included within the OWL package. The FSLIC substituted Champion Savings Association for Commerce Savings Association. As a result of this, Pulte and the FSLIC agreed to consummate the acquisition in two separate transactions-the first to include the acquisition of the four associations from the original OWL package and the second to include the acquisition of Champion Savings.

On September 9, 1988, the FHLBB held a meeting at which it adopted a resolution approving plaintiffs' first acquisition with an effective date of September 9, 1988. Also on that date, the Assistance Agreement was executed by Pulte Development Corporation,

---

6. With certain additions not relevant here, the Assistance Agreement defined a covered asset as "[e]ach asset acquired by an ACQUIRING ASSOCIATION pursuant to the Acquisition Agreements[.]" A covered asset loss was defined as "[t]he amount . . . (i) by which the Book Value of a Covered Asset exceeds the lesser of Adjusted Book Value and the Net Proceeds Received by an ACQUIRING ASSOCIATION upon the Liquidation of such Covered Asset, or (ii) of any writedown in Book Value of a Covered Asset approved by the CORPORATION pursuant to § 4."

7. Pulte contends that this proposal did not contain a provision for sharing tax benefits derived from the covered asset loss deduction. The Gov-

ernment contends that the proposal did contain such a provision.

8. Defendant "disputes any inference that discussing sharing of potential tax benefits in any way establishes a contractual right to such benefits or any duty to maintain such benefits, particularly where FSLIC had no authority to promise tax benefits." This constitutes legal argument and is non-responsive. Defendant has not identified a genuine dispute.

9. *See supra* note 8.

10. *See supra* note 8.

Inc., First Heights, Heights of Texas, and the FSLIC. Section 9, *Tax Benefits*, of the Assistance Agreement required plaintiffs to credit a Special Reserve Account or to pay the FSLIC "an amount equal to the sum of ... the Federal Net Tax Benefits." Covered asset losses were included among the "Tax Benefit Items," defined in § 9(a), to which the FSLIC was entitled a certain share. Section 9(a)(3) defined this tax benefit item:

> Any cost, expense or loss (i) which is incurred by an ACQUIRING ASSOCIATION, (ii) for which the CORPORATION has made assistance payments (excluding any payments pursuant to § 3(a)(2) or (3) of this Agreement) to the ACQUIRING ASSOCIATION pursuant to § 3(a) of this Agreement (but only to the extent that neither ACQUIRING ASSOCIATION nor any member of the Consolidated Group is required to reduce its tax basis in assets by virtue of the receipt of such payments), and (iii) which is deductible on an ACQUIRING ASSOCIATION's Federal or state income tax return or reduces the balance of the ACQUIRING ASSOCIATION's bad debt reserve balance ....

The term Federal Net Tax Benefits was defined by § 9(c), in pertinent part, as follows:

> [T]he Taxable Percentage [defined as 25% multiplied by the Current Income Percentage] multiplied by an amount equal to the excess, if any, of: (1) the Federal income tax liability for such taxable year ... which would have been incurred ... if the Tax Benefit Items described in § 9(a)(1), (3) and (4) had not been deducted, credited, or excluded in any taxable year, but without adjustment to the bad debt reserve ... over (2) the Federal income tax liability for such taxable year ... actually incurred ....

On September 23, 1988, the OWL transaction was completed with the FHLBB's approval of Pulte's acquisition of Champion Savings Association. The agreement entered into in regard to the acquisition of Champion Savings Association amended the September 9, 1988, Assistance Agreement slightly. These amendments had no material effect on the provisions in question here.

The legislative reaction to the tax benefit deals, including the Assistance Agreement in question here, was discussed in detail in our July 6, 2001, opinion in *Centex*. We refer the reader to that opinion for a discussion of Congress's actions from January 1989 to August 1993 when the Guarini legislation, which eliminated the covered asset loss deduction, was enacted.

Here we must note a point of difference from the *Centex* case. Unlike plaintiffs in *Centex*, Pulte disagreed with the FSLIC and its successor, the Federal Deposit Insurance Corporation ("FDIC"), in regard to the sharing of covered asset loss benefits derived from adjustments to the bad debt reserve.[11] Documentation submitted by the parties as attachments to supplemental briefing on the Government's prior material breach argument indicates that this dispute became acute in mid–1993. Despite this dispute, however, on September 30, 1994, the FDIC, "in accordance with Section 32(a) of the [September 9, 1988] Assistance Agreement," loaned Pulte $127 million and that Pulte executed a note promising to repay the FDIC this amount plus interest.

Although the parties continued to perform other obligations under the Assistance Agreement and no termination agreement was ever executed, their dispute over the sharing of covered asset loss benefits derived from adjustments to the bad debt reserve remained unresolved. In 1995, the FDIC brought suit against Pulte in the United States District Court for the Eastern District of Michigan ("District Court"), alleging breach of a promise to share the covered asset loss benefits derived from adjustments to the bad debt reserve.[12] In the Michigan litigation, Pulte, while acknowledging that the benefits derived from the covered asset

---

11. For a description of the bad debt reserve method of taking the covered asset loss deduction, see *Centex Corp. v. United States,* 48 Fed.Cl. 625, 632–36 (2001).

12. During this litigation, certain depositions were taken that now form the basis for defendant's RCFC 56(g) request for discovery. Those depositions shall be discussed when we address the merits of defendant's request.

loss deduction constituted a Tax Benefit Item under § 9 of the Assistance Agreement, argued that it had not agreed to share covered asset loss benefits derived from adjustments to the bad debt reserve. The District Court disagreed and found that Pulte was liable to the FDIC for breach of contract "for tax years 1988–1996." Pulte appealed this decision to the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit"). The Sixth Circuit affirmed the District Court's finding that the Assistance Agreement required Pulte to share covered asset loss benefits derived from adjustments to the bad debt reserve with the FDIC. Like the District Court, the Sixth Circuit did not state the date of breach with specificity. The Sixth Circuit remanded the case to the District Court with instructions to determine prejudgment interest. In regard to the tax benefit sharing payments arising in 1988 through 1995, the Sixth Circuit stated that "the prejudgment interest accrued thirty days after payments for each year were due." The Sixth Circuit did not, however, identify the date on which the payments became due for any particular year. The District Court has not yet issued a ruling on when any of these payments became due, and the parties are currently in settlement talks.

## DISCUSSION

The breach of contract issues presented by this case are nearly identical to those considered in our July 6, 2001, opinion in *Centex.* Before reaching those issues, however, we must first address two other issues: (1) whether the Government is excused from contractual liability under the doctrine of prior material breach and (2) whether the Government is entitled to discovery.

### I. Prior Material Breach [13]

In its response to plaintiffs' pending Renewed Cross Motion for Summary Judgment on Liability, defendant asserts that the doctrine of prior material breach bars plaintiffs from recovering on their claim that enactment of the Guarini legislation constituted a breach of the Assistance Agreement. Defendant argues that the District Court and the Sixth Circuit in the Michigan litigation found that plaintiffs materially breached the Assistance Agreement on a date prior to the date on which the Guarini legislation was enacted. As a consequence, defendant contends, plaintiffs cannot recover here. In addition, defendant argues that it has taken no action precluding it from asserting the defense of prior material breach.

For the sake of argument, we will assume that the question of whether plaintiffs materially breached the contract prior to enactment of the Guarini legislation was addressed and resolved by the Michigan litigation. Furthermore, we will assume that the answer to that question was that plaintiffs did, in fact, materially breach the Assistance Agreement prior to the date on which the Guarini legislation was enacted. We turn, therefore, to the issue of whether there are reasons to reject application of the prior material breach defense in this case.[14]

It is well settled that "[w]here there has been a material failure of performance by one party to a contract, so that a condition precedent to the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform." 14 Williston on Contracts § 43:15 (4th ed.2000). This rule accords with precedent in this circuit. In *Cities Service Helex, Inc. v. United States,* 211 Ct.Cl. 222, 234–35, 543 F.2d 1306 (1976) (citations omitted), the Court of Claims stated:

---

13. We need not decide the question of whether federal or state law governs our analysis of defendant's prior material breach defense. Defendant has asserted that federal law governs, and plaintiffs at oral argument conceded that there are no material differences between federal and state law regarding the defense of prior material breach.

14. We note that the question before us is not whether the Government was or is precluded from maintaining a cause of action for breach of the Assistance Agreement against Pulte.

A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

The *Cities Service Helex* court went on to identify four approaches to the question of whether a party's conduct precludes it from asserting prior material breach as a defense: (1) a strict approach, under which "any act indicating an intent to continue the contract is an election . . . [and] the right to end the contract [is lost]," (2) a modified approach, under which "the injured party may itself continue performance in certain circumstances and yet reserve its right to claim material breach without the breaching party's assent," (3) Professor Corbin's approach, under which "an election should not be conclusive unless facts giving rise to an estoppel exist[:] either the breaching party must have changed his position in reliance on the injured party's failure to cancel or the injured party's conduct must be such that it would be unjust to allow him to change his position," and (4) the Uniform Commercial Code approach, under which the question of "[w]hether the pursuit of one remedy bars another depends entirely on the facts of the individual case." *Cities Serv. Helex,* 211 Ct. Cl. at 235–36, 543 F.2d 1306.

▪ None of the authorities cited by defendant persuade us that the rule expressed in *Cities Service Helex* is incorrect or not binding on this court. The rule does not conflict with the holding of *College Point Boat Corp. v. United States,* 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925). In that case, the Court stated,

A party to a contract who is sued for its breach may *ordinarily* defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. . . . An unconditional right to cancel can be availed of for the purpose of terminating a contract, even after suit [is] brought, *unless some intervening change in the position of the other party renders that course inequitable.*

*Coll. Point Boat,* 267 U.S. at 15–16, 45 S.Ct. 199 (emphasis added). The rule expressed in *Cities Service Helex* addresses those situations, contemplated by the Court, in which the ordinary defense of prior material breach is not available. There is no conflict between the two cases.

▪ The *Cities Service Helex* rule is also consistent with the Restatement (Second) of Contracts ("Second Restatement"). Defendant cites to a comment to § 237 of the Second Restatement. The text of § 237 states, "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 (1981). This reiterates the general rule stated by the Court in *College Point Boat.* However, § 246 of the Second Restatement qualifies this general rule: "[A]n obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence . . . ." Restatement (Second) of Contracts § 246 (1981). The case before us fits squarely within the rule of § 246. In 1994, the obligor, the FDIC, accepted performance, i.e. the execution of a $127 million note, by the obligee, Pulte, with knowledge of the non-payment of covered asset loss benefits derived from adjustments to the bad debt reserve. Under the Second Restatement, this acceptance of performance operated as a "promise to perform in spite" of Pulte's alleged material breach.

*Ashcraft & Gerel v. Coady,* 244 F.3d 948 (D.C.Cir.2001), does not support defendant's position. In that case, the court rejected appellant Coady's argument that appellee Ashcraft & Gerel's prior material breach prevented it from maintaining a breach action against him. The court did, however, hold that it was error for the trial court not to have allowed Coady to introduce evidence of "the underlying facts" that had formed the basis for an arbitration panel's decision that Ashcraft & Gerel had breached the contract at a time prior to Coady's alleged breach. The court stated:

> [The] authorities indicate not-as Coady maintains-that the firm was barred by its alleged prior breach from suing Coady for his subsequent breach, but that Coady would be entitled to introduce evidence of the firm's prior material breach as part of his defense to the firm's claims that he breached the employment contract.

*Ashcraft & Gerel,* 244 F.3d at 952–53. The purpose of Coady's evidence was to show "that the firm had 'long planned to oust him from the Boston office and had pressured him in every way to achieve that intended result.'" *Id.* at 953. Thus, the evidence Coady sought to introduce was intended to explain his alleged breach. Such is not the case here. Defendant does not seek to introduce evidence of plaintiffs' alleged prior material breach as a way of explaining enactment of the Guarini legislation. Rather, it attempts to bar plaintiffs' claim of breach by enactment of the Guarini legislation completely. This is the very position the *Ashcraft & Gerel* court rejected.

The termination cases relied on by defendant also do not support its position. Those cases, *Dow Chemical Co. v. United States,* 226 F.3d 1334 (Fed.Cir.2000), *McDonnell Douglas Corp. v. United States,* 182 F.3d 1319 (Fed.Cir.1999), *Wetsel–Oviatt Lumber Co. v. United States,* 43 Fed.Cl. 748 (1999), and *Reservation Ranch v. United States,* 39 Fed.Cl. 696 (1997), are inapposite. In each, a party to the contract actually terminated the contract, and the question before the court

was whether that termination was valid. Here, as defendant's counsel acknowledged at oral argument, the Assistance Agreement was never terminated. It expired in 1998 by its own terms.[15] In any event, the fact that defendant may have had the right to terminate the Assistance Agreement as early as 1989 does not mean that defendant may now, after additional performance by both parties and after the Assistance Agreement has expired by its own terms, assert that it is excused from liability for any breaches it committed after 1989. To agree with defendant's argument would enable a party injured by a material breach to "continue after a material breach by the other . . . , act as if the contract remains fully in force . . . , run up damages, and then go suddenly to court." *Northern Helex Co. v. United States,* 197 Ct.Cl. 118, 125–26, 455 F.2d 546 (1972). This the law does not allow.

We return, therefore, to the four approaches outlined in *Cities Service Helex.* Under any of the four approaches, defendant is precluded from avoiding liability in this case under the prior material breach doctrine. Certainly, under the strict approach, the FDIC's willingness to extend a $127 million loan to plaintiffs in 1994 indicates an "intent to continue the contract." Additionally, there is no evidence indicating that the FDIC was "reserving" its right to claim a material breach and thereby end the contract; to the contrary, the 1994 loan is evidence that the FDIC, in fact, wanted the contract to continue. Consequently, under the modified approach, defendant is precluded from asserting prior material breach. Defendant's argument fares no better if we adopt Professor Corbin's approach. Here, the $127 million promissory note executed by Pulte in 1994 certainly suffices for a change in position "in reliance on the injured party's failure to cancel." Finally, under the Uniform Commercial Code approach, defendant's counsel's acknowledgment that the Assistance Agreement expired on its own terms in 1998 without ever having been terminated is sufficient to show that the facts of this case bar defendant from asserting prior material

---

15. Certain provisions of the Assistance Agreement did not expire in 1998. It is unnecessary to discuss these provisions at this time.

breach in this action. We reject defendant's prior material breach defense.

## II. Defendant's RCFC 56(g) Request for Discovery

■ Defendant seeks discovery in regard to Pulte's "allegations that it obtained a promise of a double-dip deduction and that it did not assume the risk of a subsequent clarification in the law." April 25, 2001, Declaration of Counsel at 3–4. Specifically, defendant seeks discovery regarding plaintiffs' subjective opinion, at the time the contract was entered into, about the availability, usefulness, and importance of the covered asset loss deduction. The basis of the request is certain deposition testimony by Pulte representatives in the Michigan litigation indicating that Pulte was not sure at the time of contracting that it would be able to take the covered asset loss deduction.

Defendant has identified no finding of fact proposed by plaintiff to which it could not respond. Rather, defendant argues that, in the event we deny its motion for summary judgment, the discovery it seeks will uncover additional facts necessary in order for us to rule on plaintiffs' summary judgment motion. We disagree.

The granting of defendant's request would not lead to the discovery of admissible evidence. The only way in which the evidence sought by defendant would be relevant would be to undermine the Assistance Agreement's definition of the covered asset loss deduction as a Tax Benefit Item. As such, this evidence defendant hopes to discover is inadmissible under the parol evidence rule that "extrinsic evidence will not be received to change the terms of a contract that is clear on its face." *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988). As the Sixth Circuit found, "section 9 [of the Assistance Agreement] is both unambiguous and coherent." *FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 537 (6th Cir.2000). Consequently, defendant is not entitled to the discovery it seeks.

This conclusion is consistent with our holding in our July 6, 2001, opinions in *Centex* and *First Nationwide*. In those opinions, although we found factually that the plaintiffs subjectively expected to take the deductions, we did not rely on those findings in deciding what the plaintiffs' reasonable expectations were. Instead, we relied on the contract itself to define the scope of the parties' expectations. Because the discovery defendant seeks is not reasonably calculated to lead to the discovery of admissible evidence, we deny defendant's RCFC 56(g) request.

## III. Breach of Contract By Enactment of the Guarini Legislation

■ Section 9 of the Assistance Agreement, like § 9 of the assistance agreement considered in our July 6, 2001, opinion in *Centex*, defined covered asset losses as a Tax Benefit Item. Furthermore, the Sixth Circuit held that § 9 entitled the FSLIC to a 25% share of the benefits plaintiffs derived from deductions taken for covered asset losses, including those derived from adjustments to the bad debt reserve. Consequently, the legal issues presented by plaintiffs' breach of contract claim based on the implied covenant of good faith and fair dealing are identical to those considered in our July 6, 2001, opinion in *Centex*. For the same reasons as expressed there, we find that defendant breached the implied covenant of good faith and fair dealing when it enacted the Guarini legislation in August 1993. Plaintiffs are thus entitled to summary judgment on count I of their complaint.

## IV. Other Counts

Pursuant to the August 15, 2001, oral argument and a subsequent telephone conference with the parties held August 16, 2001, plaintiffs have withdrawn counts IV, VIII, IX, X, XI, XII, XIII, XIV, and XV. Defendant's Motion for Partial Dismissal is accordingly denied in part as moot. Counts V and VI, plaintiffs' takings claims, are "conceptually foreclosed," *Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174, 187 n. 9 (1997), *aff'd sub nom., Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874 (Fed.Cir.1998), by our finding of contract breach and are hereby dismissed. Counts III and VII remain pending and are subject to the suspended Motion for Partial Dismissal; therefore, that portion of defendant's Mo-

tion for Partial Dismissal addressing counts III and VII also remains pending.

The only count remaining to be discussed is count II, plaintiffs' claim that certain actions taken by the FDIC were designed to encourage passage of the Guarini legislation and that this encouragement constituted an independent breach of contract. With the FDIC having succeeded in its alleged efforts to encourage enactment of the Guarini legislation, however, no remedy independent of the remedy available for the breach caused by the enactment of the Guarini legislation is available here. Indeed, if the Guarini legislation had not been enacted, plaintiffs would have been entitled to only nominal damages for any breach resulting from lobbying for passage of the legislation. Therefore, count II is hereby dismissed.

## CONCLUSION

Defendant's Motion for Partial Dismissal is denied in part as moot. The motion remains pending with respect to counts III and VII. Consideration remains suspended pending further order. The remainder of defendant's Motion for Summary Judgment is denied; plaintiffs' Renewed Cross Motion for Summary Judgment on Liability is granted with respect to count I and denied with respect to count II; and defendant's RCFC 56(g) request is denied. The parties are directed to file, on or before September 10, 2001, a joint proposal recommending further proceedings in the case.