COAST–TO–COAST FINANCIAL
CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–525C.

United States Court of Federal Claims.

June 1, 2004.

Melvin C. Garbow, Washington, D.C., for plaintiff Coast–To–Coast Financial Corporation. With him on the briefs were Howard N. Cayne, Kent A. Yalowitz, and Edward Sisson, all of counsel.

Scott Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Jeffrey T. Infelise, Brian A. Mizoguchi, and Brian L. Owsley, of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related[1] case are the cross-motions for summary judgment with respect to damages of plaintiff Coast–To–Coast Financial Corporation ("CTC"), and defendant United States. Oral argument was held on May 7, 2004.[2] For the reasons set out below, CTC's motion for summary judgment is denied and the government's cross-motion for summary judgment is granted.

## BACKGROUND

This case arises out of the acquisition from the United States of a defunct thrift, Old Lyons, a federally chartered mutual association.[3] Among the documents comprising the acquisition, there was an Assistance Agreement. The action was initially brought by four plaintiffs. Coast Partners and UBH, Inc. were investors. The bank which ultimately emerged from the transaction, Superior Bank, initially was also a plaintiff. The final plaintiff was CTC, the holding company for Superior Bank. UBH, Inc. and Coast Partners were dismissed on voluntary motion in 2003. *See* Order of February 11, 2003. Superior Bank closed in July, 2001, and was taken over by the FDIC, which thereafter was substituted as plaintiff for the bank. The FDIC was voluntarily dismissed as plaintiff in 2003. *See* Order of September 11, 2003. As a result, the only remaining plaintiff is CTC.

Two breaches are asserted in the complaint. The first is that the adoption of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. 101–73, 103 Stat. 183 (1989),[4] constituted a breach of the promise made by the United States at the time of acquisition of the defunct bank that supervisory goodwill could be used to satisfy regulatory capital requirements. The second is that there was an independent breach of contract resulting from the passage in 1993 of the "Guarini" legislation, which had the effect of eliminating part of the tax benefits upon which the transaction was predicated.[5]

In *Coast–to–Coast Financial Corp. v. United States*, 52 Fed.Cl. 352 (2002) ("*Coast I*"), we agreed with plaintiffs that passage of the Guarini legislation constituted a breach of the assistance agreement entered into between CTC and the Federal Savings and Loan Insurance Corporation ("FSLIC") in connection with the acquisition by CTC of Lyons Savings Bank. We held, as we had in similar cases, that the Guarini legislation breached an obligation of good faith and fair dealing by targeting for retroactive elimination the covered asset loss deduction previously held out to plaintiffs like CTC as an incentive to acquire failing thrifts. *See, e.g., Centex Corp. v. United States*, 49 Fed.Cl. 691 (2001).

In *Coast–to–Coast Financial Corp. v. United States*, 58 Fed.Cl. 327 (2003) ("*Coast II*"), we held that the adoption of FIRREA constituted an independent breach of the assistance agreement. In construing the various contract documents, we noted that the Federal Home Loan Bank Board ("FHLBB"), in its resolution approving the merger and acquisition and in its subsequent forbearance letter, had assured the bank of its entitlement to claim supervisory good will toward regulatory capital. The amount and

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Also pending is defendant's motion to strike documents cited in support of plaintiff's motion for summary judgment. Defendant argues that certain documents relied upon by plaintiff in its motion for summary judgment were withheld during discovery, are inadmissible hearsay, or are protected by a confidentiality agreement.

3. The FHLBB appointed the FSLIC as receiver for Old Lyons, and transferred its assets and liabilities to a new mutual association, Lyons Savings, a Federal Savings and Loan Association.

4. Pursuant to FIRREA, new and stricter regulatory capital requirements were imposed, which, over time, eliminated the use of supervisory goodwill as tangible capital and limited the amount that could be counted towards an institution's minimum core capitalization.

5. This legislation, the Omnibus Budget Reconciliation Act of 1993, Pub.L. 103–66, § 13224 (1993), is named for its primary sponsor, Representative Frank Guarini.

amortization period were separately fixed at $23.8 million and ten years, respectively. The adoption of FIRREA constituted a breach of that promise.

Familiarity with *Coast I* and *II* is assumed, although certain background facts must be emphasized. Although the availability of the covered asset tax loss was very important to CTC, and, to a lesser extent, the use of supervisory goodwill, those elements of the agreement must be viewed in the larger context. The entire transaction was comprised of several reciprocal promises.

Through the assistance agreement and related acquisition, CTC received a number of benefits. First, it was allowed to acquire Lyons Savings Bank. Lyons was converted into a stock association and CTC acquired all the stock. The net result was that CTC became the sole owner of the bank's assets and liabilities.[6] Although liabilities far exceeded the actual value of assets, presumably CTC found the entire deal worthwhile because of its desire to enter the thrift business and because the government virtually held CTC harmless from loss due to that negative value. In exchange for acquiring a failing thrift with considerable liabilities, CTC was to receive the following: reimbursement for losses resulting from capital losses on covered assets; write-down of covered assets and for certain related costs and expenses; guaranteed yield on certain covered assets; indemnification for certain unreserved claims against Lyons; indemnification for expenses of pursuing related claims; an interest bearing note in a principle amount equal to the difference between book value and fair market value of certain assets and liabilities, less $14 million; and supervisory goodwill in the amount of $23.8 million. The principal amount of the note alone was $176 million. In addition, however, CTC also acquired the right to utilize approximately $143 million in net operating losses generated by Old Lyons, as well as the right to claim covered asset loss deductions with respect to certain assets.

In exchange for what it received, or would receive, from the government, CTC took over Lyons Savings Bank, forestalling the government's need to liquidate the institution. It also was required to contribute $42.5 million in cash to the new institution. In addition, CTC promised to split the net profits of Superior Bank with the government as a way of sharing tax benefits. This sharing would come in the form of "payments-in-lieu [of taxes]" ("PIL"). Under the PIL provision of the agreement, CTC agreed to pay to FSLIC, for 10 years, in cash, 22.5% of the bank's net income before taxes. This represented a substitute for direct tax benefit sharing. We recognized in *Coast II* the importance to the parties of the tax benefit provisions.

As we also explained in our earlier opinions, the bank was responsible for maintaining a Special Reserve Account ("SRA"). In effect, this constituted a running balance as between FSLIC and the bank of the parties' various payment obligations under the assistance agreement. FSLIC's duty to pay on the note, or to reimburse for losses, for example, would be debited against the bank's obligation to make PIL payments. The bank would then demand or make a net payment, depending on whether or not it owed the government money.

FIRREA was enacted in 1989. It undercut and eventually eliminated CTC's ability to benefit from supervisory goodwill as capital. Guarini was enacted in 1993, eliminating tax benefits flowing from the deduction of capital asset losses. Despite these two breaches, the assistance agreement remained in effect from 1989 until 1998, when it expired by its own terms. Rather than terminate the agreement altogether, in 1994, in reaction to Guarini, CTC ceased making PIL payments to the SRA account. At the time the agreement expired in 1998, there was a net credit in favor of the FDIC of nearly $10 million, consisting primarily of unpaid PIL. Although the FDIC took the position that this constituted a breach by CTC, it did not call for termination of the parties' contractual arrangement.

The parties, in short, continued to operate under most terms of their contractual arrangement until 1998, three years after this law suit was filed. Neither party repudiated

---

6. In April of 1989, Lyons was renamed Superior Bank.

the contract. Over the life of the assistance agreement, FSLIC and its successor, the FDIC, paid $561 million in cash to CTC. Virtually all of this amount was paid after the passage of FIRREA, and over $85 million was paid after passage of Guarini. In addition, CTC, or its affiliated companies utilized $21.5 million of the acquired $143 million in net operating losses, for a net tax savings of $7.52 million. It was unable to utilize the rest of the NOL's, not because of any government breach, but because there was insufficient income against which to offset the losses.

Certain other developments affecting the bank between 1989 and the present are also relevant. The government points to the fact that, in 1992, the controlling stockholders of CTC merged into CTC an affiliated residential mortgage brokerage company, named Alliance Funding. CTC later contributed Alliance to Superior Bank. Thereafter, Superior became a sub-prime lender. After substantial losses were reflected on the bank's financial statements, the institution became insolvent. FDIC then seized Superior Bank on July 27, 2001. During oral argument, plaintiff's counsel represented that the cleanup cost to the government would have been in the range of $750 million, but for the fact that the Pritzger family, one of the controlling interests in Superior, contributed $460 million. The net loss precipitated by closure was thus in the range of $300 million.

CTC has limited its claim for damages to the return of its initial cash investment, $42.5 million. It characterizes its claim as one for restitution. CTC takes the view that its $42.5 million contribution was, in effect, left in the bank during the ten years it operated. Superior would have been $42.5 million further in the red in 1998, in other words, but for the government's retention of CTC's initial investment. CTC thus seeks to have the government disgorge this amount as an appropriate measure of damages for the breaches in 1989 and 1993.

## DISCUSSION

A party that can successfully assert a breach of contract typically has a choice between two types of monetary remedies: those based on compensation for loss (e.g., expectancy damages, reliance damages), and those based, not on enforcement of the contract, but on a disgorgement of benefits conferred, on the assumption that the contract was not performed. *See* Andrew Kull, *Restitution as a Remedy for Breach of Contract,* 67 So. Cal. L. Rev. 1465 (1995); Restatement (Second) of Contracts §§ 344–45, 347–49, 371–73 (1979); Restatement of Restitution § 108 (1978).[7] The latter remedy is typically referred to as restitution.

The most recent teaching by the Supreme Court on contract restitution appears in *Mobil Oil Exploration v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000). In *Mobil,* the two plaintiff oil companies, in return for an up-front bonus payment of approximately $158 million, plus annual rental payments, received a ten year renewable lease which permitted them to explore for and produce oil, provided the necessary permits were obtained. The lease commenced in 1981. In 1990, the plaintiffs had pursued successfully several steps in the permitting process and had indications that the final Department of Interior approvals would be obtained. In August 1990, however, Congress enacted a new law, The Outer Banks Protection Act ("OBPA"), 104 Stat. 555, as amended, 43 U.S.C. § 1331 et seq. (1994 & Supp. III), which prohibited the department from proceeding with approval of any such exploration or development plan.

Although the initial lease was extended during the suspension, there was no indication that the oil companies would ever be able to explore. The trial court ruled that the legislation therefore constituted an anticipatory repudiation of the contract, giving rise to a "total breach," and entitling plaintiffs to restitution. *Conoco Inc. v. United States,* 35

---

**7.** The Restatement of Restitution has little to say directly on the use of the remedy in the context of a contract breach. Instead, Section 108 incorporates by reference the more specific provisions of the Restatement (Second) of Contracts. A draft re-write of the Restatement of Restitution, on the other hand, proposes more intentionally to recognize the unique application of restitution in the contract context. See discussion, *infra,* at 712–13.

Fed.Cl. 309, 327 (1996). Shortly after the trial court's ruling the OBPA was repealed.

In holding that restitution of the oil companies' down payments was the appropriate remedy the Supreme Court summarized the law of restitution, insofar as applies in the context of a breach of contract, as follows: "[W]hen one party to a contract repudiates that contract, the other party 'is entitled to restitution of any benefit that he has conferred on' the repudiating party 'by way of part performance or reliance.'" *Mobil*, 530 U.S. at 608, 120 S.Ct. 2423 (quoting the RESTATEMENT (SECOND) OF CONTRACTS § 373 (1979)). Under the Restatement, in turn, repudiation is a "statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach." RESTATEMENT (SECOND) OF CONTRACTS § 250. A total breach is a breach that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Id.* § 243.

█ The concepts of repudiation, total breach, and restitution are thus linked in contract law. If a party repudiates a contract at a time when there is still substantial performance remaining (other than simply payment of the contract price), or if a party commits a breach which the other party can treat as "total," then restitution can be an appropriate remedy.

█ *Mobil* also makes clear that repudiation and total breach are linked to another phenomenon, namely, that a wronged party can waive its right to restitutionary relief under certain circumstances: "Indeed, acceptance of performance under a once-repudiated contract can constitute a waiver of the right to restitution that repudiation would otherwise create." *Mobil*, 530 U.S. at 622, 120 S.Ct. 2423 (citing RESTATEMENT (SECOND) OF CONTRACTS § 373 cmt. a).[8] However, a party does not waive its right to restitution

simply by urging performance, but must actually receive some significant benefit from continuation of the contract. *Id.* at 622–23, 120 S.Ct. 2423.

Plaintiff relies on *Mobil* to illustrate the point that restitution was allowed, despite the fact that much of the contract period had run, and that the breaching party presumably could have been made to perform at a subsequent time. It characterizes the breach in *Mobil* as "truly a breach of timing only." Tr. May 7, 2004, at 12. This is presumably related to the fact that OBPA was subsequently repealed at a time when the state of North Carolina had indicated an intent to exercise its veto rights to exploration.

We do not attach the same significance to the fact of repeal as does plaintiff. At the time the trial court ruled, there was no reason to think that repeal was imminent. The court was forced to cope with the facts as it found them: namely, one party-the government-had expressed an unwillingness to perform. The obligee oil companies had every right to treat the OBPA as an anticipatory total breach-a repudiation. There was nothing conditional about the legislation. The facts thus formed a classic setting for rescission and restitution: the breaching party had the injured party's money and announced that it refused to perform its side of the bargain. Although at that point the government had performed the critical act of executing the leases, its inherent power as sovereign created the need for continuing cooperation. The government would have fulfilled its remaining duties simply by doing nothing to bar the oil companies throughout the remainder of the lease term. In that sense, the government's performance remained completely executory before passage of OBPA. Even after execution of the leases, the government still held within its control all the consideration which the oil companies thought they had previously obtained, namely the right to explore for and produce oil.[9]

---

8. Comment a includes the statement: "A party who has lost the right to claim damages for total breach by, for example, acceptance or retention of performance with knowledge of defects (§ 246), has also lost the right to restitution."

9. We agree with plaintiff, however, to this extent. It is true that the majority appears unconcerned with the fact that the oil companies might be getting a windfall, in that repeal of the federal ban exposed the real possibility that exploration

The most recent articulation of restitution in this circuit is in *Hansen v. United States*, 367 F.3d 1297 (Fed.Cir.2004), also a *Winstar* case. The focus of the Federal Circuit's opinion was whether the passage of FIRREA constituted a total breach and therefore warranted the remedy of restitution. The trial court, relying on the Supreme Court's treatment in *Winstar*, concluded that the breach was material and warranted the remedy of restitution of the investment amount. The Federal Circuit reversed, concluding that the issue of "total breach" was not foreclosed, and instead, had to be addressed in light of the particular facts. *Id.*, 367 F.3d at 1316, 2004 WL 1048186 at *14. It therefore remanded the case to the trial court. In doing so, however, it relied on section 241 of the Restatement (Second) of Contracts, which sets out illustrative circumstances which are relevant in determining the materiality of a breach.[10] It also relied on George E. Palmer, *The Law of Restitution:* "the breach 'must be of a relatively high degree of importance.... In deciding whether the breach is essential enough to justify restitution, a court should be concerned primarily with the objective of the plaintiff in seeking the performance promised by the defendant.'" *Hansen*, 367 F.3d at 1312, 2004 WL 1048186, *11 (citing GEORGE E. PALMER, THE LAW OF RESTITUTION (1978), at § 4.5).

The court in *Hansen* also explained that, even if the breach is of sufficient materiality to warrant restitution, the injured party "may be compensated only for the *net* loss that results from the defendant's breach." *Id.*, 367 F.3d at 1315, 2004 WL 1048186, *13 (citing *Landmark*, 256 F.3d at 1373 ("Because the purpose of restitution is to restore the plaintiff to its status quo ante, the award to the plaintiff must be reduced by the value of any benefits that it received from the defendant under the contract, so that only the actual, or net, loss is compensated.")).

This requirement is drawn from the Restatement (Second) of Contracts: "[A] party will not be granted restitution unless he ... returns or offers to return ... any interest in property that he has received in exchange in substantially as good condition as when it was received by him ...." As the comments to that section explain, the "objective is to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract." RE-STATEMENT (SECOND) OF CONTRACTS § 384 cmt. a.

■ From both *Mobil* and *Hansen*, in short, we conclude that waiver, repudiation, total breach, and the requirement to "net out" exchanges are inextricably linked. Restitution is only available in the event of a total breach, or, what amounts to the same thing, a repudiation. Even if the breach, at the time it occurred, *could* be treated as total, or as a repudiation, it ceases to be a repudiation or grounds for avoiding the contract if the injured party continues to receive performance. Continuing to receive performance and repudiation are thus mutually exclusive. Only if there is a total breach or repudiation, and if there is no waiver, is it necessary to attempt to unscramble the reciprocal exchanges.

We pause in this attempt to summarize the current law in this circuit to note that there has been a lively debate in the contract community about differences between the first two Restatements of Contracts insofar as restitution is concerned. The debate involves, among other issues, whether restitution in the contract context is something in the nature of a separate cause of action premised on unjust enrichment, or whether it is simply an alternative remedy for breach-or whether it can be both. The debate is summarized by Peter Birks in, *Unjust Enrich-*

might never take place, not because of the United States, but because of the state of North Carolina. The larger point, however, remains. The contract was, at the time of the prohibition, for all practical purposes executory. As we explain below, the present facts are very different.

**10.** 1) the extent to the which the injured party has been deprived of the benefit of the bargain; 2) the extent to which the injured party can be

adequately compensated for that loss; 3) the extent to which the breaching party would suffer forfeiture if the breach were treated as material; 4) the likelihood that the breaching party will cure; and 5) the extent to which the breaching party's conduct comports with good faith and fair dealing. RESTATEMENT (SECOND) OF CONTRACTS § 241.

*ment and Wrongful Enrichment.* 79 TEX. L.REV. 1767 (2001). The article describes the schism in the law of restitution between the quadrationists, who believe that the law of restitution and the law of unjust enrichment form a single square that can be named indifferently from either response or causative event, and the multicausalists, who believe that restitution is the law's response to a number of different causative events....

*Id.* at 1767. Although an eavesdropper might think the debate comparable in intensity to Augustine's debates with the Pelagians, it fortunately has not broken out into open hostilities or declarations of anathema.

It is sufficient for the more casual observer to note that the majority view appears to be reflected in the draft version of the Restatement (Third) of Restitution, edited by Professor Andrew Kull of Boston University. The restitution re-draft much more explicitly carves out a place for restitution as a contract remedy. It thus takes the position of the "multicausalists," namely, that restitution is simply an alternative remedy to breach of a contract. The draft restatement links the remedy, in a contract context, to the traditional contract concept of rescission:

> § 37. Rescission as a Remedy for Breach of Contract
>
> (1) ... a plaintiff entitled to damages for the defendant's total breach of contract may choose rescission of the contract as an alternative remedy for breach. The object of rescission is to restore the plaintiff to the precontractual status quo. To this end, a decree of rescission may require the defendant
>
>> (a) to make specific restitution of property transferred under the contract;
>>
>> (b) repay amounts received on account of the contract price;
>>
>> ....
>
> A plaintiff who obtains such relief must restore to the defendant the value received by way of performance ....

RESTATEMENT (THIRD) OF RESTITUTION § 37 (Tentative Draft No. 3, 2004).

11. Plaintiff makes no real argument as to the criticality of supervisory goodwill.

The majority view therefore appears to be that restitution is available, even in the context of express contracts, as an alternative remedy for breach, independent of a showing of unjust enrichment. What is equally apparent is that the remedy assumes two things: proof of total breach (or its equivalent, repudiation), and a desire to unravel the contract and return to the status quo ante. We find these same requirements in *Mobil* and *Hansen.*

Plaintiff focuses its motion for summary judgment on the first requirement-namely, whether the breaches, and more particularly, Guarini,[11] were "total." For that reason it has offered numerous proposed findings (mostly contested by defendant) highlighting the importance of the opportunity to deduct covered asset losses to the acquisition. In sum, plaintiff contends that it never would have acquired Lyons unless those tax benefits had been included.

There were at least two types of tax benefits, however-covered asset loss deductions and deduction of net operating losses inherited from Old Lyons. Only the former were eliminated by Guarini. We are prepared to assume, however, that at the time of the passage of Guarini, plaintiff could have declared a total breach.

The difficulty for plaintiff, nevertheless, is the second requirement highlighted above, namely, that the purpose, indeed, the presumption behind restitution, is a desire to return the parties to the pre-contractual status quo. This presumption is fleshed out in two related elements of the remedy: 1) a return of consideration received from the breaching party, and 2) the absence of waiver of the total breach or repudiation. These requirements, in our view, are completely at odds with continued performance of the contract. When applied in the context of a breach of contract, restitution is thus presumed on the assumption that the breach is so substantial that the offended party not only has the right to declare a total breach, *but has actually done so.*[12] If, on the other

12. We use the word "typically" advisedly. We recognize that in narrow circumstances, restitu-

hand, there has been substantial performance by either or both parties, the presumptive remedy has to be fashioned out of the parties' contractual expectations. *I.e.,* the injured party should be paid for its performance under contract pricing, or it should be compensated for its lost expectancy rights if the breaching party fails to perform.

Plaintiff acknowledges that the present facts are not typical for invoking restitution-the last breach occurred in 1993, while the contract continued until 1998. CTC continued to receive performance under the contract for nine years after FIRREA, and five years after Guarini. During that time, it continued to operate the bank and it continued to utilize acquired net operating losses. In the process, it received an estimated $170 million in government assistance after adoption of FIRREA and at least $85 million after adoption of Guarini. Neither party purported to repudiate the contract, nor did either accuse the other of repudiation. Nor has plaintiff offered to return the parties to the pre-contract status quo. Indeed, doing so would be tantamount to reassembling Humpty Dumpty.

To meet these objections, plaintiff attempts to isolate two elements of consideration which it characterizes as directly reciprocal: on the one hand the $42.5 million it initially invested and, on the other hand, the covered asset tax benefits. To get to that point, however, all other elements of the consideration exchanged must, in effect, cancel each other out.

■ We cannot accept this approach to construing the contract. As the Federal Circuit taught in *Stone Forest Industries, Inc. v. United States,* 973 F.2d 1548 (Fed.Cir.1992), there is a presumption that, "when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." *Id.* at 1552. There is no reason, in the present facts, to link plaintiff's initial investment solely to the covered asset loss tax benefits. On the contrary, the present contract had multiple components, with each side having continuing reciprocal obligations. The government offered CTC: the right to take over Lyons and thus get into the thrift business; the opportunity to assert the net operating losses taken over from Lyons; covered asset tax losses; and a wide array of financial guarantees, only one element of which consisted of supervisory goodwill. The plaintiff not only put in its down payment, it took over the bank and agreed to share profits with the government. The $42.5 million was simply an undifferentiated part of plaintiff's consideration for the acquisition and for the assistance agreement

■ Nor was the $42.5 million which plaintiff now seeks retained in violation of any specific contract term; it cannot be traced to any specific non-performance by the government. Unlike the circumstances in *First Nationwide v. United States,* 56 Fed.Cl. 438 (2003), there is no direct link between the breaches and the asserted retention of CTC's initial contribution. It is important to note in this connection that plaintiff does not claim that the seizure of Superior Bank was improper, or that it compounded the injury flowing from the breaches represented by FIRREA and Guarini. There is no "delict," in short, arising from the seizing of the "assets" of the bank.

Plaintiff nevertheless argues that there is precedent for the use of restitution in these unusual circumstances. It points, for example, to *Landmark Land Co. v. United States,* 256 F.3d 1365 (Fed.Cir.2001). In that *Winstar* case, Landmark had acquired two failing thrifts in a supervised acquisition. It contributed $21.5 million in cash and real estate to the deal. In 1991 the new entity became bankrupt and was seized. The Federal Circuit affirmed the trial court's award of a return of Landmark's initial investment.

Plaintiff points out that, like the present facts, the thrift in *Landmark* ultimately emerged after a series of acquisitions and mergers which transformed the constituent

tion of downpayments or funds wrongfully withheld can be ordered despite the fact that performance had occurred and the contract was not truly divisible. *See, e.g., Stone Forest Industries, Inc. v. United States,* 973 F.2d 1548 (Fed.Cir. 1992); *First Nationwide v. United States,* 56 Fed. Cl. 438 (2003). We believe that the special circumstances of those cases are not applicable here.

elements. In addition, the thrift in *Land-mark*, like the thrift here, ultimately failed and was seized. From this, plaintiff argues that, like the investor in *Landmark*, it should be able to recover its initial investment.

There are more differences than similarities here, however. It is important to note that *Landmark* apparently did not involve financial assistance from the regulatory agencies. Nor did it have the complex tax sharing arrangement presently before the court. The only consideration flowing from the United States referred to by the Federal Circuit, other than the transfer of ownership of the banks, was regulatory forbearance with respect to treatment of supervisory goodwill. Nor does the question of whether the breach was total or waived appear to have been raised.

We also note that the court held the following: "[R]estitution restores to the non-breaching party the net loss that he suffered as a result of his performance under the contract. With respect to the assistance agreement, that would be accomplished by awarding Landmark the value of its 'property conveyed [under the contract] less the reasonable value of any counter-performance received' by Landmark from the government." *Id.* at 1372 (quoting JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 15–4, at 651 (3d ed.1987)). Apparently the only "counter-performance" proffered by defendant in that case consisted of dividends upstreamed to the parent. The court rejected that component of disgorgement, as we would here, for lack of proof (at least on the current state of the record). Unlike *Landmark*, in other words, the continued performance here was with respect to a complex, ongoing relationship with multiple moving parts.

Plaintiff also cites *Stone Forest*, 973 F.2d 1548, a case involving a timber contract. *Stone Forest* presents unusual facts. The plaintiff timber company had made the mistake of entering into an unfavorable contract, half of which had been performed, but at a loss. Congress then enacted legislation rendering access to four of the remaining timber tracts virtually impossible. Stone Forest partially had paid in advance for the right to harvest timber. Stone Forest refused to go forward with the contract due to the asserted loss of access to the four tracts, which represented approximately 16% of the timber. The Forest Service declared Stone Forest to be in breach and forfeited the remaining advance payment.

Stone Forest sued to recover the forfeited down payment, claiming a total breach of the contract. The question framed by the Federal Circuit was whether the breach was "total." If it was, then Stone Forest's obligations under the contract were at an end. It was not in breach with respect to any of the remaining contract, it could seek a return of the unused down payment. If, on the other hand, the contract were divisible, Stone Forest would have continued to be obligated with respect to those tracts that were still accessible.

The Federal Circuit concluded that the Forest Service's refusal to permit access to approximately 16% of the total timber was a material breach, giving the timber company the right to declare a total breach, and forgiving its duty to perform. Plaintiff draws heavily on the court's emphasis on the plaintiff's purposes in entering into the contract. Because those purposes were frustrated by the loss of access to four of the tracts, the court permitted plaintiff to treat the repudiation as total, and not partial, setting up restitution.

As we discuss above, we can agree with plaintiff that the passage of Guarini so frustrated its purposes acquiring Old Lyons that it could have treated the legislation as grounds for declaring a total breach. It did not do so, however. It elected to keep the bank along with all the financial assistance and net operating losses. At this point, restitution is no longer a meaningful option. It is no answer to say that it would have been difficult to prove expectancy damages. Plaintiff would not have been legally foreclosed from attempting to establish them. The fact that they might have been difficult to prove in the circumstances is irrelevant.

The result here is confirmed by the court's prior rejection of defendant's counterclaim, in which it argued that Superior Bank com-

mitted a material breach prior to the enactment of the Guarini legislation, thereby excusing the government of any subsequent breach. *Coast I* at 362–63. The material breach alleged was that CTC ceased making PIL payments to the SRA; the damages asserted were the failure to pay FDIC the $11 million balance at the time the agreement terminated.

We held that the government had waived the argument that the bank's alleged prior failure to bring the SRA account to "zero" was a prior material breach, which could serve as a comprehensive defense:

> The SRA was an ongoing account. There is no dispute that the government accepted credits to the SRA, paid certain "subsidiary" and "technical assistance" expenses, and audited the SRA several times from 1990–96, all according to the Agreement. These actions indicate that the government continued performance under the contract despite perceived material breaches by Superior. CTC relied on the government's failure to cancel the contract by continuing to make payments to the SRA. The Agreement terminated by its own terms in 1998, despite the government's argument that the investor plaintiffs breached it years before.

*Id.* We relied in coming to this conclusion on *First Heights v. United States*, 51 Fed.Cl. 659 (2001), another Guarini-related *Winstar* case. We noted in that case, that

> It is well settled that "[w]here there has been a material failure of performance by one party to a contract, so that a condition precedent to the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform."

*Id.* at 663 (quoting 14 WILLISTON ON CONTRACTS § 43:15 (4th ed.2000)). We rejected the defense in *First Heights* in part because

the FDIC accepted payment of a note with knowledge that the thrift acquirer had already breached the assistance agreement. *Id.* at 665–66.

We also relied in our prior ruling in this case on *Cities Service Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306 (1976), where the Court of Claims stated:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

*Id.*, 543 F.2d at 1313 (footnote omitted).

We believe that this reasoning with respect to waiver of a prior material breach has relevance to the present issue as well. *Both* parties were content to proceed with certain aspects of the contractual arrangement. Neither party offered to unscramble the deal by having the FSLIC or FDIC take over the bank. Neither party proposed ending the assistant payments. Superior did not propose giving up the net operating losses it received from Old Lyons, and FSLIC did not propose giving up its right to share in net profits through PIL payments. By electing to continue to give and receive performance, the parties made it impossible to order restitution as a remedy for breach.

During oral argument, the court asked counsel whether it had preserved any other damages theory than restitution. Counsel candidly conceded that plaintiff had narrowed the claim to that theory.[13]

13. "It would have made a los[t]-profits claim difficult to prove .... Whether it would have been sufficiently certain to meet the standards for recovery is an open question, [but] one we will never have to decide because we didn't pursue such a theory.... The only damages theory

 

## CONCLUSION

We deny plaintiff's motion for summary judgment and grant defendant's motion. We also deny defendant's motion to strike.[14] No further parties or issues remaining, we direct the clerk to dismiss the claim with prejudice. We deem it appropriate for each side to bear its own costs. Although there has been no monetary recovery, defendant breached the contract. Judgment accordingly.

---

that we laid out was a restitutional theory." Tr. May 7, 2004, at 6–8. This assessment was correct. In its June 26, 2002, "Response of Coast-to–Coast Financial Corporation ... to the Draft Scheduling Order Dated June 24, 2002," plaintiff stated that it "agree[d] that damages discovery should be limited to restitution .... Investor Plaintiffs seek only one restitutionary award-the $42.5 million they invested as required by the terms of the Transaction." This was confirmed by plaintiff's August 15, 2002 unified damages exhibit: "Coast–to–Coast seeks one award in this case: restitution .... Coast–to–Coast acknowledges that on the record available, it would be difficult to prove expectancy damages ...." All pre-trial activities subsequent to these expressions of plaintiff's position, including discovery, have been based on the assumption that the only claim being advanced was for restitution. We take plaintiff at its word and hold that all other theories of recovery have been abandoned.

14. While we have misgivings about the admissibility of some of the materials relied upon by plaintiff in its motion for summary judgment, we deny the defendant's motion to strike as moot in light of our ruling on defendant's motion for summary judgment.